**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Phillip GRANDINETTI, Jr.,
Defendant–Appellant.**

**No. 88–2696.**

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 28, 1989.

Decided Dec. 20, 1989.

---

Robert W. Kent, Jr., (argued), David J. Stetler, Asst. U.S. Attys., Crim. Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Patrick A. Tuite, Tuite, Mejia & Giacchetti, Leslie A. Jones (argued), Johnson, Schaaf & Jones, Chicago, Ill., for defendant-appellant.

Before POSNER and RIPPLE, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

ESCHBACH, Senior Circuit Judge.

This appeal is from a jury trial wherein the defendant was convicted on charges of conspiracy, misapplication of savings and loan ("S & L") funds, and fraud. He now claims that the evidence presented at trial is insufficient to support the convictions. His claims ring hollow, for the evidence provides more than enough support. Accordingly, we affirm.

## I.

In April, 1987, Philip Grandinetti, Jr. ("Grandinetti"), Marvin Juron ("Juron"), and William Reinschreiber ("Reinschreiber") were charged with criminal violations by a nine-count information. Count One charged the group with conspiracy to misapply funds of A.J. Smith Federal Savings and Loan Association ("Smith Federal"), a federally insured financial institution, and conspiracy to make false statements to Smith Federal relating to that misapplication, all in violation of 18 U.S.C. § 371.[1] In furtherance of this conspiracy Grandinetti purportedly took part in bribing Smith Federal's president, Reinschreiber, and in submitting to Smith Federal inflated appraisals and documents containing false information. Count Two charged that the trio of Grandinetti, Juron, and Reinschreiber caused the misapplication of Smith Federal funds in violation of 18 U.S.C. §§ 657 & 2.[2] The crux of this Count against Grandinetti was, again, that Grandinetti participated in the Reinschreiber bribe and the submission of false information to Smith Federal. Counts Three through Nine charged Grandinetti and Juron with a scheme to defraud Smith Federal and Hawkeye Bank & Trust Company ("Hawkeye"), another federally insured financial institution, and with furthering that scheme through mail fraud in violation of 18 U.S.C. § 1341.[3] These Counts realleged, basically, the scheme outlined in Counts One and Two, and further alleged that Grandinetti had participated in the submission to Hawkeye of inflated appraisals and forged collateral assignments for the purpose of inducing a loan. Seven

---

1. That statute states, in relevant part, as follows:
   If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined ... or imprisoned ... or both.

2. Section 657 provides in relevant part:
   Whoever, being an officer, agent or employee of or connected in any capacity with ... any savings and loan corporation or association ... or any institution the accounts of which are insured by the Federal Savings and Loan Insurance Corporation ...embezzles, abstracts, purloins, or willfully misapplies any moneys, funds, credits, securities or other things of value belonging to such institution, or pledged or otherwise intrusted to its care, shall be fined ... or imprisoned ... or both.
   Section 2 states:

   (a) Whoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal.
   (b) Whoever willfully causes an act to be done which if directly performed by him or another would be an offense against the United States, is punishable as a principal.

3. That section provides in relevant part:
   Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, ... for the purpose of executing such scheme or artifice or attempting to do so, places in any post office or authorized depository for mail matter ... or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail ... any such matter or thing, shall be fined ... or imprisoned ... or both.

incidences were recited in which the mails were used to further the scheme.

The trio's case went to trial in March, 1988, and the following story emerged: Grandinetti and Juron were partners in a real estate company called Juron Development Company ("JDC" or "the Company"). Grandinetti was the major player in the Company, receiving 90% of all JDC gains on the sale of real estate (and bearing 90% of all losses) and 62.5% of all JDC profit (or loss) from real estate rentals. His responsibilities were sales and day-to-day operations. Juron was the Company's law and finance man. In 1979 the Company purchased a condominium development called English Valley. A substantial part of the purchase price was paid with $675,000 obtained from Smith Federal. Also obtained from Smith Federal was $2,621,000 needed to finance construction on the project and commitments to loan $1.5 million to purchasers of English Valley condos. JDC sold 46 condominiums by November of 1980 and used the proceeds from these sales to pay down the construction loan, among other things. That same November, however, a recession hit the area; English Valley sales slowed and ultimately stopped. JDC was left with 49 unsold English Valley units, bleak prospects, and virtually no cash flow from which the remaining balance on the Smith Federal loan could be paid.

On January 29, 1981, Juron transferred the 49 unsold units to 49 trusts, naming himself as beneficiary. This apparently was the first step in an effort to have the units transferred out of JDC in return for money from Smith Federal. The next step was to get help from "the inside" of Smith Federal. Help was obtained when Juron and Grandinetti bribed Reinschreiber with $25,000. The story of the bribe was related at trial by Anthony Finnochio ("Finnochio"), an acquaintance and confidant of Grandinetti. Finnochio testified that he received a phone call from Grandinetti around late February of 1981 in which Grandinetti asked him if he was interested in lunch and told him that he was meeting Juron by Smith Federal. Finnochio accepted the lunch invitation and drove to Grandinetti's office. Once there, Finnochio was informed by Grandinetti that they were going to make a payment to Reinschreiber and showed Finnochio an envelope stuffed with $25,000 in $100 bills. The pair left for a Wendy's restaurant across the street from Smith Federal. They met Juron and the three of them sat down to eat, Grandinetti and Juron sitting away from Finnochio in order to speak privately. While eating Finnochio overheard the following:

Grandinetti: Are you sure the deal will go through?

Juron: If the old man accepts the package, then we will have a deal.

"Old man" was a nickname used by the two for Reinschreiber. Finnochio also saw Grandinetti reluctantly hand Juron what appeared to be the envelope containing the $25,000. After lunch, Juron left for Smith Federal. Finnochio later saw him in Reinschreiber's office talking to Reinschreiber (the office is glass-enclosed) while Finnochio was in Smith Federal to use its restroom (the one at Wendy's being inoperative).

About two weeks after the bribe, Reinschreiber arranged with an appraiser for the submission to Smith Federal of bogus, grossly inflated appraisals of the English Valley condominiums. These appraisals valued the units at prices 40% higher than approximate market value. A little later Grandinetti and Juron negotiated transfers of most of the 49 units to Finnochio, Barry Kipnis ("Kipnis") and Richard Rosen ("Rosen"), Kipnis and Rosen being JDC's accountants. Prior to these negotiations Grandinetti had told Finnochio that sales at English Valley were dead and that transfers would relieve JDC's financial pressures. On April 1 the five men entered into several purchase agreements, each one providing, among other things, (1) that the purchaser would buy condos at the prices set out in the agreements (which corresponded exactly with the values that Reinschreiber had given the appraiser—overstating approximate market value by 40%); (2) that the purchaser would apply for an 80% of purchase price mortgage from Smith Federal (the remaining 20% coming

from a down payment); (3) that JDC would bear all costs and expenses associated with the deal; (4) that JDC would hold the purchaser harmless with respect to the 20% down payment; (5) that JDC would receive all rents; and (6) that the purchaser could take all tax deductions. Riders were signed by Grandinetti and Juron making them co-guarantors of all debt incurred in the deal. On April 7, 1981, and on various later dates, the transfers occurred. No money ever changed hands between the parties and JDC. No down payments were ever made.

Later in April closing documents were submitted to Smith Federal. The documents included the inflated appraisals and the purchase agreements containing false information. The closing documents were reviewed by Smith Federal's loan committee, of which Reinschreiber was a member, and, with his advice, the loans were approved. $2.1 million in below-market interest rate funds then were disbursed to JDC.

JDC had projects other than English Valley. One of them was the Fairway Shopping Center, which was financed in part by a $500,000 loan from Hawkeye Bank. Hawkeye had been doing business with Juron for some time and with Grandinetti even longer. In fact, Grandinetti had introduced Juron to Hawkeye's president, Douglas Grinde ("Grinde"). The relationship was a continuing one, in part because JDC could never pay off the $500,000 loan. On June 15, 1982, Juron, Grandinetti, and Grinde met to discuss a solution to the loan problem.[4] At the meeting Juron requested new funds of $1.2 million, out of which the $500,000 loan could be repaid, and offered in exchange collateral including second assignments on the English Valley trusts. To induce the loan, Grinde was given an apparently false appraisal, one that valued the 49 condos at $3 million. He also was told that $15,000 to $17,000 of equity was imbued in each condominium trust.

Later that year, in July, after much correspondence between JDC and Hawkeye, Grinde traveled to English Valley and received a three hour tour from Grandinetti and Juron. Grinde told the pair that Hawkeye would consider their loan request if they could assure him that the 49 condominiums would be sold within six months. Both Grandinetti and Juron gave their assurances. Grinde returned to Hawkeye, and on July 22, 1982, Juron mailed him second collateral assignments of the 49 trusts. The assignments were purportedly signed by Juron, Finnochio, Kipnis, and Rosen but in reality the signatures of all but Juron were forged. On July 26, 1982, the assignments were recorded. That same day the loan closed and JDC received about $1.1 million in fresh funds.

For the next few years things held together for Grandinetti, Juron, and JDC. Payments to Smith Federal proceeded apace and the Hawkeye loan was continually renewed. Although Grandinetti had continuing contact with Finnochio, Kipnis, and Rosen, he never let the three on to the fact that second collateral assignments had been made in their names. But in 1984 things turned sour. Payments to Smith Federal ceased. Grandinetti was forced to inform Hawkeye that no efforts had been made to sell the 49 units and that JDC was in "serious trouble." In September Finnochio, Kipnis, and Rosen were served with foreclosure notices and, upon investigation, learned of the purported assignments to Hawkeye. They informed the bank that their signatures had been forged and that its collateral was nonexistent. Hawkeye had to take a loss of approximately $1.1 million on its loan to JDC. Smith Federal did little better, eventually writing off about $1 million.

At the conclusion of the trial verdicts were returned finding all three defendants guilty on all nine counts. Grandinetti filed a motion for judgment of acquittal, for new trial or for arrest of judgment. The district court denied the motion, as it had an earlier motion for directed verdict. Grandinetti subsequently was sentenced to serve

---

**4.** To Grinde there apparently was not much difference in dealing with Juron as opposed to Grandinetti, or vice-versa. During the course of the JDC banking relationship Juron had told Grinde that Grandinetti was his "clone," one who spoke for Juron.

two years in prison with probation and other conditions following.

## II.

■ Grandinetti challenges the sufficiency of the evidence. We note at the outset that his challenge has no merit with regard to most of the elements necessary to establish his crime. There is no question, for example, that the government established the existence and furtherance of a conspiracy and a scheme to defraud and, indeed, Grandinetti's participation therein. But Grandinetti's challenge focuses elsewhere. He argues specifically that the government failed to establish one particular fact: his *knowing, intentional,* or *purposeful* participation in the conspiracies, schemes, and actions with which he is charged. Our precedent shows that such "knowledge" or "intent" is an element essential to the charges against him. *See, e.g., United States v. Velasquez,* 772 F.2d 1348, 1351 (7th Cir.1985), *cert. denied,* 475 U.S. 1021, 106 S.Ct. 1211, 89 L.Ed.2d 323 (1986) (conspiracy); *United States v. Silva,* 781 F.2d 106, 108–09 (7th Cir.1986) (mail fraud). *See also* 18 U.S.C. §§ 2 & 657 (use of the term "willfully"). And, of course, the government's proof of all but one element of a crime is not enough to make a prosecution successful. *See Velasquez, supra,* at 1355. Apparent, then, is the need for proof showing Grandinetti's criminal knowledge or intent. Our task is to examine the evidence and determine if a sufficient quantum of that proof exists.

We construe the evidence in the light most favorable to the prosecution. *United States v. Dunigan,* 884 F.2d 1010, 1013 (7th Cir.1989). This means that we note all direct and circumstantial evidence presented, *United States v. Williams,* 858 F.2d 1218, 1221 (7th Cir.1988), *cert. denied, Froschauer v. United States,* — U.S. ——, 109 S.Ct. 796, 102 L.Ed.2d 787 (1989), and draw therefrom all reasonable inferences supporting the government's case. *United States v. Nesbitt,* 852 F.2d 1502, 1509 (7th Cir.1988), *cert. denied,* — U.S. ——, 109 S.Ct. 808, 102 L.Ed.2d 798 (1989). Against this legal backdrop, and with a full view of the proof presented at trial, we must opine that the evidence is sufficient to support Grandinetti's convictions.

The circumstantial evidence clearly supports a finding of Grandinetti's criminal knowledge and intent. From the facts previously summarized it can be inferred, quite reasonably, that Grandinetti knew of the financial plight of JDC, and moreover, when considering that Grandinetti bore the lion's share of JDC losses, that he had a motive to defraud the financial institutions. Concerning Smith Federal, we think it sensible to deduce from the trial proof, viewed in light of Grandinetti's experience and managerial position, that he knew the sales prices recited in the "purchase agreements" were vastly inflated and that the implication of down payments on the English Valley units was false, and, further, that he knew that the agreements would be submitted to Smith Federal for a routine review prior to the granting of any loan. The requisite *mens rea* is established by proof that the defendant willfully shut his eyes for fear of what he might see if he opened them. *United States v. Cerro,* 775 F.2d 908, 911 (7th Cir.1985); *United States v. Josefik,* 753 F.2d 585, 589 (7th Cir.), *cert. denied, Soteras v. United States,* 471 U.S. 1055, 105 S.Ct. 2117, 85 L.Ed.2d 481 (1985). The circumstantial evidence, at the very least, shows such ostrich-like behavior. Furthermore, with regard to Hawkeye Bank, we believe that the circumstantial evidence allows an inference of Grandinetti's knowledge that fraud was being used to obtain the Hawkeye loan and his intent for it to be so used. A jury is " 'permitted to infer from one fact the existence of another essential to guilt, if reason and experience support the inference.' " *United States v. Key,* 725 F.2d 1123, 1128 (7th Cir.1984) (quoting *Tot v. United States,* 319 U.S. 463, 467, 63 S.Ct. 1241, 1244, 87 L.Ed. 1519 (1943). Taking heed of Grandinetti's experience and position, his involvement in the Smith Federal caper, and his presence and participation in the loan pitch to Hawkeye, the needed inference seems so supported.

When we consider the direct evidence— the eyewitness testimony of Finnochio—it

is clear that any question of Grandinetti's criminal participation in the schemes and conspiracies is completely foreclosed, as is any question concerning his willful inducement of Reinschreiber's misapplication of funds. Finnochio's testimony catches Grandinetti in the act. It removes all doubt of his knowing participation in the fraud against Smith Federal and it strengthens to an unassailable level an inference of his intent to defraud Hawkeye Bank.

The totality of evidence, then, circumstantial as well as direct, lays a foundation from which a rational juror could find beyond a reasonable doubt Grandinetti's knowing participation in the conspiracies, schemes, and acts to defraud the financial institutions. It also lays a foundation from which such a juror could conclude, beyond a reasonable doubt, that Grandinetti was guilty of all the crimes charged. Thus, our review is satisfied. *See Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. Whaley,* 830 F.2d 1469, 1472 (7th Cir.1987), *cert. denied,* 486 U.S. 1009, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988). The evidence supporting Grandinetti's convictions is sufficient.

▮▮▮ It seems the inevitability of this conclusion was not lost on the defendant. To avoid it he makes further argument and asks the Court to disqualify the crucial testimony of Finnochio. Once that testimony is reduced to the dustbin of irrelevancy, Grandinetti implies, the evidence cannot possibly be sufficient to sustain his convictions. " 'It is well settled law,' " however, " 'that a court of appeals does not stand in judgment of the credibility of witnesses. Rather, that question is left to the sound discretion of the trier of fact.' " *United States v. Perry,* 747 F.2d 1165, 1170 (7th Cir.1984) (quoting *United States v. Roman,* 728 F.2d 846, 856 (7th Cir.), *cert. denied,* 466 U.S. 977, 104 S.Ct. 2360, 80 L.Ed.2d 832 (1984)). *See also United States v. D'Antoni,* 874 F.2d 1214, 1221 (7th Cir.1989). This Court will not review jury determinations of testimonial truth absent "extraordinary circumstances." *Unit-*

*ed States v. Garner,* 837 F.2d 1404, 1423 (7th Cir.1987), *cert. denied,* 486 U.S. 1035, 108 S.Ct. 2022, 100 L.Ed.2d 608 (1988). Our hesitation to review is based not on mere caprice, but on sound reasons of law, efficiency, and institutional competence. *See United States v. DeCorte,* 851 F.2d 948, 952–53 (7th Cir.1988). To motivate our disregard of those reasons, Grandinetti must show testimony outrageous to the highest degree, testimony "incredible as a matter of law." *Dunigan, supra,* at 1013. He must show that the challenged testimony is "unbelievable on its face," proving that it was "physically impossible for the witness to observe that which he or she claims occurred" or that it was "impossible under the laws of nature for the occurrence to have taken place at all." *Id.* Proof that the witness's testimony is inconsistent is simply not enough. *Id.* Grandinetti must demonstrate *conclusively* that the witness's testimony amounts to nothing more than a bald-faced lie, that it lacks any semblance of probative value.

This he has not done. He makes many arguments, for instance, that Finnochio's trial tale is inconsistent in crucial respects from earlier versions told to the FBI and the grand jury, that it is uncorroborated at every point, that Finnochio himself is a proven liar and a cheat with a bias against Grandinetti and a motive to do him in. But none of his rhetoric leads to the conclusion that Finnochio's testimony conflicts with rules governing the physical universe or the realm of the physically possible. Finnochio's story, it is true, shows some marginal inconsistencies. But in the main it remained the same throughout its many renditions. Moreover, defendant's claim notwithstanding, critical aspects of it were corroborated by other evidence. *See United States v. Tucker,* 773 F.2d 136, 139–40 (7th Cir.1985) (where corroboration exists, incredibility less of a concern), *cert. denied,* 478 U.S. 1022, 106 S.Ct. 3338, 92 L.Ed.2d 742 (1986). And Grandinetti's attack *ad hominem* is overstated at the least and, what's more, irrelevant, for reversal " 'is not required because the government's case includes testimony by "an array of scoundrels, liars and brigands." ' " *United*

*States v. Xehka,* 704 F.2d 974, 988 (7th Cir.), *cert. denied,* 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983) (quoting *United States v. Hewitt,* 663 F.2d 1381, 1385 (11th Cir.1981)).

Grandinetti invites this Court to believe him instead of Finnochio. The jury did not. And "[w]e refuse to superimpose our judgment over that of the finder of fact." *De-Corte, supra,* at 953. Grandinetti's argument does not clear the hurdle placed before him on appeal. *See United States v. Noble,* 754 F.2d 1324 (7th Cir.), *cert. denied,* 474 U.S. 818, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985); *United States v. Tanner,* 471 F.2d 128 (7th Cir.), *cert. denied,* 409 U.S. 949, 93 S.Ct. 269, 34 L.Ed.2d 220 (1972). Accordingly, Finnochio's testimony remains in the evidence, and Grandinetti's convictions remain on the books.

For the foregoing reasons, the judgment of the district court is AFFIRMED.