UNITED STATES of America

v.

Phillip DeGERATTO.

No. HCR 87–139.

United States District Court,
N.D. Indiana,
South Bend Division.

Jan. 5, 1990.

Kevin Milner, John Hoehner, Hammond, Ind., for plaintiff.

Thomas P. Sullivan, Charles B. Sklarsky, Gayle Erjavac, Jenner & Block, Chicago, Ill., for defendant.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

On December 14, 1987, the Grand Jury for the Northern District of Indiana returned an indictment in nine counts against the defendant, Phillip DeGeratto. Count 1 charges DeGeratto with conspiracy relating to the interstate transportation and receipt of truckloads of stolen meat products in violation of 18 U.S.C. § 371. Counts 2, 5 and 8 charge DeGeratto with the interstate transportation of stolen trucks in violation of 18 U.S.C. §§ 2312 and 2. Counts 3, 6 and 9 charge DeGeratto with the interstate transportation of stolen meat products in violation of 18 U.S.C. §§ 2314 and 2. Counts 4 and 7 charge DeGeratto with the possession of meat products stolen from interstate shipments in violation of 18 U.S.C. §§ 659 and 2.

On February 15, 1988, DeGeratto was found guilty by a jury setting in Hammond, Indiana on all nine counts in the indictment. DeGeratto was tried in Hammond before the Honorable James T. Moody of this court. On September 8, 1988, DeGeratto was sentenced by Judge Moody to seven years imprisonment, a $65,000.00 fine, and restitution in the amount of $72,426.38. On direct appeal, the Seventh Circuit reversed on the basis of the admission of prejudicial evidence and prosecutorial misconduct and remanded for a new trial. *United States v. DeGeratto*, 876 F.2d 576 (7th Cir.1989).

On November 29, 1989, a retrial commenced before the undersigned judge. The defendant waived his constitutional right to a jury trial and consented to a bench trial.[1]

---

1. The court fully complied with the mandates of    *United States v. Scott,* 583 F.2d 362 (7th Cir.

The court then proceeded with a bench trial which was completed on December 4, 1989. Following closing arguments, the court ordered the parties to submit supplemental briefs. The government and DeGeratto have submitted their supplemental briefs. The court now holds that the government has met its burden and that DeGeratto is GUILTY beyond a reasonable doubt on all nine counts in the indictment.

## I. FINDINGS OF FACT

The court is compelled to cast some light upon the trial of this case before making its findings of fact. This case was prosecuted by two very experienced and able Assistant United States Attorneys who conducted a vigorous prosecution that stayed within the boundaries announced by Justice Sutherland in *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). *See also United States v. Mackey*, 571 F.2d 376 (7th Cir.1978); *United States v. Meeker*, 558 F.2d 387 (7th Cir.1977). This case also was defended by a group of highly talented and experienced criminal defense lawyers. Judge David L. Bazelon, former Chief Judge of the United States Court of Appeals for the District of Columbia Circuit, was often quoted as saying that certain lawyers were walking violations of the Sixth Amendment. In this case, defense counsel were the living exemplification of that amendment. They fulfilled their obligation with regard to the defense of DeGeratto in the highest tradition of the Sixth Amendment and in accordance with the standards announced in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

The government introduced overwhelming evidence at trial of a criminal conspiracy, the object of which was the interstate transportation and receipt of truckloads of stolen meat products. The government presented its evidence of the conspiracy through five participants: Eddie Rains, Ronnie Dowden, George Perry, Alix Douyon, and Gerald Piazzi. Rains, Dowden, and Perry assisted in stealing the truckloads of meat. Douyon was a middleman who fenced the stolen meat. Piazzi was a meat buyer for three stores managed by DeGeratto. Piazzi purchased the truckloads of stolen meat from Douyon and another middleman. All five men plead guilty to offenses arising from the same or similar crimes that are charged to DeGeratto. Each of the men cooperated with the government and testified pursuant to their plea agreements. Douyon and Piazzi's testimony directly implicated DeGeratto as a knowing and willing participant in the conspiracy. According to them, DeGeratto authorized Piazzi to purchase the truckloads of stolen meat. The stolen meat was then sold in the stores managed by DeGeratto.

DeGeratto's defense at trial was that Piazzi acted alone without DeGeratto's knowledge or approval. DeGeratto did not testify as is his right under the Fifth Amendment of the United States Constitution. Instead, DeGeratto challenged the credibility and veracity of Douyon and Piazzi, the two participants directly implicating him. He repeatedly impeached them with prior inconsistent statements, omissions, and contradictions from prior proceedings. DeGeratto has vehemently maintained throughout this case that both Douyon and Piazzi have clear motives to falsely implicate him in order to minimize their own involvement, to curry favor with the government, and to reduce punishment for their crimes. DeGeratto now contends that the repeated impeachment of Douyon and Piazzi confirms that they have merely fabricated a story implicating him.

DeGeratto also offered the testimony of James Peterson, Jr., and James Peterson, Sr., two meat suppliers. The Petersons both testified that they once paid cash kick-

---

1978), in finding that DeGeratto knowingly and voluntarily waived his Sixth Amendment right to a trial by jury. *See also United States v. Rodriguez*, 888 F.2d 519, 526–28 (7th Cir.1989). The waiver was in writing and signed by DeGeratto. Additionally, the required colloquy took place in open court between DeGeratto and the

court regarding his Sixth Amendment rights. *See, e.g., United States v. Delgado*, 635 F.2d 889, 890 (7th Cir.1981) (spelling out the contents of such a colloquy). Therefore, the record is clear that DeGeratto knowingly and voluntarily waived his constitutional right to a jury trial on all nine counts in the indictment.

backs to Piazzi in order to get Piazzi to purchase meat from them. Piazzi admitted at trial that he was involved in the cash kickback scheme and that DeGeratto was unaware of the scheme. It is undisputed that the cash kickback scheme is conduct that is not related to the conspiracy in this case. Nevertheless, through the Petersons, DeGeratto attempted to show that Piazzi on other occasions had misused his position as a meat buyer without DeGeratto's knowledge. Thus, he now argues, Piazzi could have easily purchased the stolen meat products in this case without DeGeratto's knowledge or approval.

In the court's view, the only significant witness offered by DeGeratto was Jerry Hubbard, an employee of the stores managed by DeGeratto. Hubbard was in charge of the safes at the three stores. Hubbard testified that he never gave any cash to Piazzi to pay the thieves, that he never put any IOUs in the safes for the amount given to Piazzi, and that he never cashed any checks for Piazzi other than Piazzi's payroll check. Hubbard's testimony directly conflicts with Piazzi's testimony that Hubbard did all of the above. (The significance of this evidence will be recognized in the court's findings of fact.) The court notes that Hubbard has not been charged for any crimes arising from the conspiracy in this case. Hubbard's attorney was present at the trial, and DeGeratto is paying Hubbard's legal fees. Hubbard is still employed by DeGeratto and has known DeGeratto for approximately 25 years. The court viewed the demeanor of Hubbard at trial and, as a result, does not give much weight to his testimony.

Two FBI tape recordings also were introduced into evidence. The first tape is of a conversation between Perry and Piazzi taped after Perry began cooperating with the FBI. *See* Government Exhibit 9. Piazzi did not know he was being taped. In that conversation, Piazzi undoubtedly implicated himself in the conspiracy. Piazzi's references to DeGeratto in that conversation, however, are ambiguous at best. The second tape is of a conversation between Piazzi and DeGeratto which was taped after Piazzi began cooperating with the FBI.

*See* Government Exhibit 11. This conversation occurred almost two years after DeGeratto knew that the FBI had entered the case. DeGeratto did not make any inculpatory admissions during that conversation, and he also told Piazzi to tell the truth to the FBI. DeGeratto now argues that he did not know he was being taped and that the tape is exculpatory. There can be no doubt that DeGeratto was being very coy during that taped conversation, and the tone and quality of that conversation is in stark contrast to other evidence regarding his conversational style.

In finding the facts, the court must determine beyond a reasonable doubt whether DeGeratto was a knowing and willing participant in the criminal conspiracy in this case. When proving who participated in a criminal conspiracy, it is of practical necessity that federal prosecutors make arrangements with those participants who have been on the inside of these secret enterprises. This is precisely what occurred in this case. Two major participants, Douyon and Piazzi, plead guilty in exchange for information regarding DeGeratto's involvement in the conspiracy. The battleground in this trial was largely over the credibility and the believability of these two witnesses. This case, therefore, really comes down to the credibility of Douyon and Piazzi, undisputed participants in the conspiracy.

It appears that DeGeratto is not contending that this court should disbelieve the testimony of Douyon and Piazzi as a matter of law. The Seventh Circuit recently observed:

> To be incredible as a matter of law, a witness' testimony must be unbelievable on its face. In other words, it must have been either physically impossible for the witness to observe that which he or she claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all. *United States v. Garner,* 581 F.2d 481, 485 (5th Cir.1978). *Mere inconsistencies in the witness' testimony do not render it legally incredible. Id.* See also *United States v. Byrd,* 771 F.2d 215, 224 (7th Cir.1985).

*United States v. Dunigan,* 884 F.2d 1010, 1013 (7th Cir.1989) (emphasis added). The court certainly watched the mannerisms and heard carefully the testimony of Douyon and Piazzi. The court is well aware that the testimony of informants, accomplices, and those who have received beneficial treatment from the government should always be examined with caution and great care. *See United States v. Braxton,* 877 F.2d 556, 564–65 (7th Cir.1989); *United States ex rel. Swimley v. Nesbitt,* 608 F.2d 1130, 1133 (7th Cir.1979); *United States v. Rajewski,* 526 F.2d 149, 160–61 (7th Cir. 1975), *cert. denied,* 426 U.S. 908, 96 S.Ct. 2231, 48 L.Ed.2d 833 (1976). However, "[the court] cannot expect that witnesses will possess the credibility of people of the cloth, such as rabbis, priests, and nuns; that is why one of the [trier of fact's] roles is to decide the credibility of witnesses." *United States v. Rovetuso,* 768 F.2d 809, 818 (7th Cir.1985), *cert. denied,* 474 U.S. 1076, 106 S.Ct. 838, 88 L.Ed.2d 809 (1986). The court has approached the process of determining the credibility of all the witnesses, and particularly Douyon and Piazzi, with these inhibitions in mind.

Most recently, Judge Eschbach, speaking for the Seventh Circuit in *United States v. Grandinetti,* 891 F.2d 1302, 1306–1307 (7th Cir.1989), provided relevant insight into the all important factfinding and credibility determination process:

> The circumstantial evidence clearly supports a finding of Grandinetti's criminal knowledge and intent. From the facts previously summarized it can be inferred, quite reasonably, that Grandinetti knew of the financial plight of JDC, and moreover, when considering that Grandinetti bore the lion's share of JDC losses, that he had a motive to defraud the financial institutions. Concerning Smith Federal, we think it sensible to deduce from the trial proof, viewed in the light of Grandinetti's experience and managerial position, that he knew the sales prices recited in the "purchase agreements" were vastly inflated and that the implication of down payments on the English Valley units was false, and, further, that he knew that the agree-ments would be submitted to Smith Federal for a routine review prior to the granting of any loan. The requisite *mens rea* is established by proof that the defendant willfully shut his eyes for fear of what he might see if he opened them. *United States v. Cerro,* 775 F.2d 908, 911 (7th Cir.1985); *United States v. Josefik,* 753 F.2d 585, 589 (7th Cir.), *cert. denied, Soteras v. United States,* 471 U.S. 1055 [105 S.Ct. 2117, 85 L.Ed.2d 481] (1985). The circumstantial evidence, at the very least, shows such ostrich-like behavior. Furthermore, with regard to Hawkeye bank, we believe that the circumstantial evidence allows an inference of Grandinetti's knowledge that fraud was being used to obtain the Hawkeye loan and his intent for it to be so used. A jury is "'permitted to infer from one fact the existence of another essential to guilt, if reason and experience support the inference.'" *United States v. Key,* 725 F.2d 1123, 1128 (7th Cir.1984) (quoting *Tot v. United States,* 319 U.S. 463, 467, 63 S.Ct. 1241, 1244, 87 L.Ed. 1519 (1943). Taking heed of Grandinetti's experience and position, his involvement in the Smith Federal caper, and his presence and participation in the loan pitch to Hawkeye, the needed inference seems so supported.

When we consider the direct evidence—the eyewitness testimony of Finnochio—it is clear that any question of Grandinetti's criminal participation in the schemes and conspiracies is completely foreclosed, as is any question concerning his willful inducement of Reinschreiber's misapplication of funds. Finnochio's testimony catches Grandinetti in the act. It removes all doubt of his knowing participation in the fraud against Smith Federal and it strengthens to an unassailable level an inference of his intent to defraud Hawkeye Bank.

Douyon and Piazzi have told their version of the events to the FBI, to a grand jury, to a jury in the first trial, and now to the undersigned judge. It is true that DeGeratto has been able to establish in this trial prior inconsistencies, omissions, and

contradictions in the testimony of Douyon and Piazzi. Nevertheless, there is a centrality to the testimony of these two witnesses that focuses directly on the involvement and the participation of DeGeratto in the conspiracy in this case. The impeachment of these two witnesses was on the periphery of their testimony, and not on the centrality of their testimony. Despite all of the inhibitions that the court, as the trier of fact, must honor with respect to such accomplice testimony, the court finds as credible the central part of Douyon and Piazzi's testimony that DeGeratto was not only a participant but a behind the scenes moving force in the conspiracy in this case. With all deference to the very able performance of defense counsel, the court does not conceive that these two witnesses were impeached on their slices of penetrating and devastating evidence. Finding Douyon and Piazzi's version of the events as credible, the court's findings of fact follow.

DeGeratto was the general manager of three Buddy Bear Food Centers in Chicago, Illinois. The actual owner of the three stores was the Loren Corporation. The stores were located on Chicago Avenue, Cicero Avenue, and Roosevelt Road. "Buddy Bear" is the nickname and business name of DeGeratto. The meat departments in each store were operated as concessions. Loren Corporation received 19% of the gross meat sales as part of its arrangement with the meat concessionaires. Gerald Piazzi was the meat buyer for the Loren Corporation and therefore purchased the meat for the concessionaires of each store. When a store received meat, the concessionaire would sign the invoice and then forward it to a store bookkeeper. The bookkeeper would then draw a check payable to the supplier of the meat. Piazzi would then compare the invoices with the checks, approve the checks, and then forward the checks to DeGeratto for signature.

### First Theft

On December 17, 1982, Eddie Rains a/k/a Joe Clark, Lummy Crawford, and George Perry stole a truck from a truck stop in Sawyer, Michigan. The truck contained a cargo of 1,326 turkeys that had an approximate value of $18,620.85. The three men then transported the truck to Michigan City, Indiana. In Michigan City, Rains gave Perry the bill of lading. Perry then called Alix Douyon. (Perry and Douyon first met during their involvement with the theft of a truckload of butter, which occurred in the spring of 1982.) Douyon then called DeGeratto. (Douyon and DeGeratto first met through the sale of a copier. Douyon knew that DeGeratto was in the market for stolen goods. In the spring of 1982, Douyon tried to sell DeGeratto the truckload of stolen butter discussed above. DeGeratto, however, did not buy the stolen butter because the butter would be too conspicuous in the stores.) DeGeratto wanted to know when the turkeys had been stolen and the price and the amount of the turkeys. Douyon then called Perry and Perry provided Douyon with this information. Douyon then called DeGeratto and DeGeratto instructed him to call Gerald Piazzi to make arrangements to have the turkeys delivered the next morning. (Douyon and Piazzi first met through DeGeratto at the Roosevelt Road store a few months before this first theft.) Douyon then called Piazzi and Piazzi instructed him to deliver the turkeys to the Roosevelt Road store the next morning. Douyon then called Perry and told Perry the delivery instructions.

After speaking with Douyon, Piazzi called DeGeratto to confirm the delivery of the turkeys. Piazzi and DeGeratto had previously discussed buying stolen goods from Douyon when Piazzi and Douyon first met through DeGeratto. DeGeratto instructed Piazzi to get the money for the thieves from Jerry Hubbard. Hubbard was an employee of the Loren Corporation and had access to the safes of the three stores. Piazzi then called Hubbard and made arrangements to have Hubbard give him approximately $4,000 to $6,000 for the thieves. Hubbard was to put an IOU for this amount in the safes. This amount represented one half of the total payment to the thieves. DeGeratto had instructed Piazzi to pay the thieves only half of the

money up front so that if anyone got caught he, DeGeratto, would only lose half of the money.

On the next morning, Rains and Crawford transported the truckload of turkeys from Michigan City, Indiana to the Roosevelt Road store pursuant to Perry's instructions. Perry, Douyon and Piazzi were present during the delivery of the turkeys. After the turkeys were unloaded, Piazzi gave Perry a paper bag of money. Earlier in the morning, Hubbard had given Piazzi the paper bag of money. Piazzi told Perry that he, Perry, would receive the remaining half of the money in a few days. Perry did not keep any of the money. Rather, he used the money to pay Douyon, Rains and Crawford. Rains and Crawford ultimately abandoned the empty truck approximately 10 to 15 blocks from the Roosevelt Road store. A few days later, Perry went to the Chicago Avenue store where Piazzi gave him an additional $4,000 to $6,000, the remaining half of the money. Once again, Piazzi obtained this money from Hubbard.

After delivery of the turkeys, Piazzi called DeGeratto. Pursuant to DeGeratto's instructions, Piazzi made three phony invoices for each store. A fictitious company was used as the supplier of the turkeys. The wholesale value of the turkeys was used as the amount charged to the fictitious company. Piazzi then placed the phony invoices in with the legitimate invoices. Without knowledge that the invoices were phony, the bookkeepers prepared checks for payment to the fictitious company. The checks were then forwarded to Piazzi for his approval. Piazzi then delivered the three bogus checks to DeGeratto and DeGeratto signed the checks. DeGeratto then instructed Piazzi to give the checks to Hubbard so that Hubbard could "straighten out" the safes. Piazzi did so. Hubbard then cashed the Roosevelt Road check, paid off the IOU in that store's safe, and then gave the difference to Piazzi. Piazzi then gave this money to DeGeratto who in turn gave Piazzi approximately $2,000 to $3,000.

## Second Theft

On April 30, 1983, Rains, Perry, and Ronnie Dowden stole a truck from a truck stop in Michigan City, Indiana. The truck contained a cargo of pork and processed meats that had a combined value of $53,805.53. Rains gave Perry the bill of lading. Perry ultimately called Douyon who in turn called DeGeratto. Douyon told DeGeratto that the meat had just been stolen the day before. DeGeratto once again instructed Douyon to call Piazzi to make arrangements for delivery of the stolen meat. Douyon then called Piazzi and they made arrangements for delivery of the meat to the Roosevelt Road store on the following morning. Piazzi then called DeGeratto and DeGeratto instructed him to handle the delivery of the stolen meat in the same manner as the first theft. Meanwhile, Douyon called Perry who in turn contacted Rains and Dowden about the delivery instructions.

On the following morning, Rains and Dowden transported the truckload of pork and processed meats to the Roosevelt Road store. Perry and Piazzi were present during the delivery. As with the first theft, Piazzi gave Perry half of the money in a paper bag. Beforehand, Hubbard had given Piazzi the paper bag of money. Perry then used the money to pay Douyon, Rains, and Dowden. Rains and Dowden ultimately abandoned the empty truck in the same manner as the first theft. A few days later, Perry went to the Chicago Avenue store and received the remaining half of the money from Piazzi. Hubbard once again gave Piazzi this money.

After delivery of the pork and processed meats, Piazzi called DeGeratto and DeGeratto told him to handle the paperwork in the same manner as the first theft. Once again, Piazzi made out three phony invoices for each store, approved the checks, gave the checks to DeGeratto to sign, and then gave the checks to Hubbard. Hubbard then cashed the Roosevelt Road check, paid off the IOU in that store's safe, and then gave the difference to Piazzi. Piazzi then gave this money to DeGeratto who in turn gave Piazzi approximately $2,000 to $3,000.

### Third Theft

On June 15, 1984, Rains and Jim Hurley stole a truck from a truck stop in Gary, Indiana. The truck contained a cargo of 1,415 boxes of assorted meat products that had an approximate value of $58,790.14. Rains and Hurley transported the truck to Merrillville, Indiana. Rains then called Pierre Romeus. (Rains and Romeus first met through Perry.) Romeus then called Piazzi about the stolen meat. (Romeus and Piazzi first met through DeGeratto shortly after the second theft. DeGeratto knew Romeus was dealing in stolen goods.) Piazzi then called DeGeratto and DeGeratto authorized the deal. DeGeratto instructed Piazzi to proceed in the same manner as the first two thefts with respect to the method of payment. Piazzi then informed Romeus that delivery could not be made until Monday morning. The theft occurred on a Friday. Romeus then met with Rains and told Rains the delivery instructions.

On Sunday evening, Rains and Hurley transported the truckload of assorted meat products from Indiana to Illinois. Meanwhile, the FBI had been surveilling the truck. Once in Illinois, Rains and Hurley stopped at a parking lot to take off a lock. The FBI then moved in and arrested both men. When the truck did not arrive on Monday morning, Piazzi called Romeus and Romeus told Piazzi that the FBI was involved. Shortly thereafter, Piazzi called DeGeratto and told him about the FBI. DeGeratto asked Piazzi if he, Piazzi, bought anything from Romeus. Piazzi responded no and DeGeratto told him not to worry about it.

## II. ANALYSIS

### Count 1

Count 1 of the indictment charges DeGeratto with conspiracy relating to the interstate transportation and receipt of truckloads of stolen meat products in violation of 18 U.S.C. § 371.[2] In order to con-

vict DeGeratto for conspiracy under 18 U.S.C. § 371, the government must prove beyond a reasonable doubt: "(1) an agreement to accomplish an illegal objective against the United States; (2) one or more overt acts in furtherance of the illegal purpose; and (3) the intent to commit the substantive offense." *United States v. Hooks*, 848 F.2d 785, 792 (7th Cir.1988). *See also United States v. Gaddis*, 877 F.2d 605, 608 (7th Cir.1989).

It is well established that "[a] conspiracy is a combination of two or more individuals formed for the purpose of committing a criminal act through their joint efforts." *Gaddis*, 877 F.2d at 608. *See also United States v. Carrasco*, 887 F.2d 794, 807 (7th Cir.1989). "Once a conspiracy is shown to exist evidence that establishes a particular defendant's participation beyond a reasonable doubt, although the connection between defendant and conspiracy is slight, is sufficient to convict." *United States v. Xheka*, 704 F.2d 974, 988 (7th Cir.1983), *cert. denied*, 464 U.S. 993, 104 S.Ct. 486, 78 L.Ed.2d 682 (1983). *See also United States v. De Ortiz*, 883 F.2d 515, 522 (7th Cir.1989); *United States v. Adamo*, 882 F.2d 1218, 1223 (7th Cir.1989); *United States v. Braasch*, 505 F.2d 139, 148 (7th Cir.1974), *cert. denied*, 421 U.S. 910, 95 S.Ct. 1562, 43 L.Ed.2d 775 (1975). The so-called slight evidence rule, however, should not be used as a vehicle to relieve the prosecution of proving beyond a reasonable doubt that a defendant was a knowing and willing participant in a conspiracy. *De Ortiz*, 883 F.2d at 522.

When proving a single conspiracy existed, the government need only establish that the parties to the agreement were aware that others were participating in the scheme. *United States v. Boucher*, 796 F.2d 972, 975 (7th Cir.1986). There is no requirement that the participants in the conspiracy personally know each other or that they participate in every facet of the

---

**2.** 18 U.S.C. § 371 provides in relevant part:

    If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and

one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

   *    *    *    *    *    *

conspiracy. *United States v. Noble*, 754 F.2d 1324, 1329 (7th Cir.1985), *cert. denied*, 474 U.S. 818, 106 S.Ct. 63, 88 L.Ed.2d 51 (1985). Additionally, "[c]ircumstantial evidence may appropriately be utilized to demonstrate both a conspiracy and the defendant's participation in the conspiracy." *United States v. Vega*, 860 F.2d 779, 793 (7th Cir.1988). Moreover, circumstantial evidence may be the sole support for a conviction. *United States v. Grier*, 866 F.2d 908, 923 (7th Cir.1989).

Justice Robert H. Jackson once stated that "[t]he modern crime of conspiracy is so vague that it almost defies definition." *Krulewitch v. United States*, 336 U.S. 440, 446, 69 S.Ct. 716, 720, 93 L.Ed. 790 (1949) (Jackson, J., concurring) (footnote omitted). The proof of criminal conspiracies by a prosecutor is frequently a difficult task. Such conspiracies are born in and operate in secrecy. The task of proving such conspiracies has been made somewhat easier for the prosecution by the Supreme Court of the United States in *Bourjaily v. United States*, 483 U.S. 171, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987). Nonetheless, it remains the burden of the government to prove beyond a reasonable doubt that a conspiracy existed and that a defendant was a knowing and willing participant in the conspiracy.

■ Here, there is no doubt whatsoever that a criminal conspiracy existed, the object of which was the interstate transportation and receipt of truckloads of stolen meat products. Counsel for DeGeratto in opening argument conceded that two truckloads of stolen meat were delivered to the Roosevelt Road store and that Piazzi on each occasion paid the thieves for the meat. Counsel also conceded that Piazzi arranged to have a third truckload of stolen meat delivered to the same store—the truckload seized by the FBI. Additionally, the findings of fact unquestionably establish that DeGeratto knew of and participated in these events. He officially entered the conspiracy when he authorized Piazzi to

purchase the stolen truckload of turkeys from Douyon in December of 1982. His participation continued through June of 1984 when he authorized Piazzi to purchase the stolen truckload of assorted meat products from Romeus.

DeGeratto played more than a minor role in this conspiracy. His actions were clearly intended to advance the object of the conspiracy. He was instrumental in arranging the delivery of the stolen meat products to the Roosevelt Road store and in arranging the method of payment to all of his coconspirators. Not only did DeGeratto know of Piazzi's role in the conspiracy, but he also knew that the middlemen, Douyon and Romeus, were dealing in stolen goods. DeGeratto personally negotiated with Douyon for the meat stolen in the first two thefts. The court, therefore, concludes that the government has proved beyond a reasonable doubt that a conspiracy existed and that DeGeratto was a knowing and willing participant in the conspiracy. DeGeratto is therefore guilty beyond a reasonable doubt of violating 18 U.S.C. § 371 as charged in Count 1 of the indictment.

### Counts 2–9

The remaining counts in the indictment, Counts 2 through 9, charge DeGeratto with the substantive offenses for which his coconspirators were convicted. There is no dispute that DeGeratto did not personally participate in these substantive offenses. Nevertheless, DeGeratto can be held liable for these substantive offenses under either one of two theories and the government argues both. First, DeGeratto can be found guilty of these offenses under the doctrine of vicarious coconspirator liability. Secondly, DeGeratto can be found guilty of these offenses as an aider and abettor under 18 U.S.C. § 2.[3] Liability under one theory practically parallels liability under the other theory. The court, however, is not going to address liability under 18 U.S.C. § 2, for the court is going to bottom its decision on vicarious coconspirator liability.

---

**3.** Counts 2 through 9 of the indictment charge DeGeratto with aiding and abetting the substan-

tive offenses in violation of 18 U.S.C. § 2.

■ A conspirator can be found guilty of the crimes committed by a coconspirator in furtherance of the conspiracy. *Pinkerton v. United States*, 328 U.S. 640, 645–48, 66 S.Ct. 1180, 1183–85, 90 L.Ed. 1489 (1946); *United States v. Troop*, 890 F.2d 1393, 1399 (7th Cir.1989). "The [*Pinkerton*] doctrine is based on the idea that the conspirators are agents of each other and just as a principal is bound by the acts of his agents within the scope of the agency, so is a conspirator bound by the act of his coconspirators." *Troop*, 890 F.2d at 1399. In order to convict DeGeratto of a substantive offense under the *Pinkerton* doctrine, the government must prove beyond a reasonable doubt: (1) that the essential elements of the substantive offense have been established; (2) that the substantive offense was committed in furtherance of the overall conspiracy; and (3) that DeGeratto was a member of the conspiracy at the time the substantive offense was committed. *See United States v. Zabic*, 745 F.2d 464, 474–75 (7th Cir.1984). If the government sustains its burden with respect to a substantive offense, the *Pinkerton* doctrine applies and DeGeratto may be found guilty of that substantive offense even though he did not personally participate in the acts constituting that offense. The court now addresses the government's proof with respect to each substantive offense.

### Counts 2, 5 and 8

■ Counts 2, 5 and 8 charge DeGeratto with the interstate transportation of the trucks stolen in each of the respective thefts, all in violation of 18 U.S.C. § 2312.[4] Under 18 U.S.C. § 2312, the government must prove beyond a reasonable doubt that each truck was stolen, that each truck was transported in interstate commerce, and that the persons transporting each truck knew that the particular truck was stolen. *See United States v. Wiesner*, 789 F.2d 1264, 1267 (7th Cir.1986). With respect to Count 2, the government proved that in December of 1982, DeGeratto's coconspirators stole a truck in Sawyer, Michigan,

transported it to Michigan City, Indiana, and then transported it to Chicago, Illinois. With respect to Count 5, the government proved that in April of 1983, DeGeratto's coconspirators stole a truck in Michigan City, Indiana and then transported it to Chicago, Illinois. With respect to Count 8, the government proved that in June of 1984, DeGeratto's coconspirators stole a truck in Gary, Indiana and then transported it to Chicago, Illinois. Thus, the government has proved beyond a reasonable doubt the essential elements of the substantive offenses charged in Counts 2, 5 and 8 of the indictment.

■ An issue does arise as to whether DeGeratto was a member of the conspiracy when the substantive offense charged in Count 2 of the indictment was committed. Count 2 charges DeGeratto with the interstate transportation of the truck stolen in the first theft. In December of 1982, DeGeratto's coconspirators transported the stolen truck from Sawyer, Michigan to Michigan City, Indiana in violation of 18 U.S.C. § 2312. This offense occurred before DeGeratto joined the conspiracy. A conspirator can not be held criminally liable for substantive offenses committed by members of the conspiracy before that conspirator joined the conspiracy. *United States v. Covelli*, 738 F.2d 847, 859 (7th Cir.1984), *cert. denied*, 469 U.S. 867, 105 S.Ct. 211, 83 L.Ed.2d 141 (1984); *United States v. Knippenberg*, 502 F.2d 1056, 1059 (7th Cir.1974). However, DeGeratto's coconspirators also violated 18 U.S.C. § 2312 when they transported the stolen truck from Michigan City, Indiana to the Roosevelt Road store in Chicago, Illinois the following morning. This latter offense occurred after DeGeratto joined the conspiracy. Count 2 only charges DeGeratto with this latter offense of transporting the stolen truck from Indiana to Illinois. The court therefore finds that DeGeratto was a member of the conspiracy when the substantive offense charged in Count 2 was committed.

---

**4.** 18 U.S.C. § 2312 provides in full:
   Whoever transports in interstate or foreign commerce a motor vehicle or aircraft, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

The court concludes that the government has proved beyond a reasonable doubt the essential elements of the substantive offenses charged in Counts 2, 5 and 8 of the indictment. Furthermore, the court finds that the government has proved beyond a reasonable doubt that these substantive offenses were committed in furtherance of the conspiracy and that DeGeratto was a member of the conspiracy at the time these offenses were committed. Therefore, under *Pinkerton*, DeGeratto is guilty beyond a reasonable doubt of violating 18 U.S.C. § 2312 as charged in Counts 2, 5 and 8 of the indictment.

### Counts 3, 6 and 9

■ Counts 3, 6 and 9 charge DeGeratto with the interstate transportation of the meat products stolen in each of the respective thefts, all in violation of 18 U.S.C. § 2314.[5] Under 18 U.S.C. § 2314, the government must prove beyond a reasonable doubt that the meat products were transported in interstate commerce and that the persons transporting the meat knew that it had been stolen. *See United States v. Holland*, 831 F.2d 717, 721 (7th Cir.1987). The government also must prove beyond a reasonable doubt that the value of the meat products stolen in each of the respective thefts exceeded $5,000.

It has been established that DeGeratto's coconspirators stole and transported in interstate commerce the trucks involved in each theft. DeGeratto's coconspirators also knew that these stolen trucks contained meat products. Hence, the coconspirators transported the meat products in interstate commerce with knowledge that the meat had been stolen. It also is uncontroverted that the value of each of the respective shipments of meat exceeded $5,000. Thus, the government has proved beyond a reasonable doubt the essential elements of the substantive offenses charged in Counts 3, 6 and 9 of the indictment.

As with Count 2, an issue arises as to whether DeGeratto was a member of the conspiracy when the substantive offense charged in Count 3 of the indictment was committed. Count 3 charges DeGeratto with the interstate transportation of the turkeys stolen in the first theft. In December of 1982, DeGeratto's coconspirators transported the stolen turkeys from Sawyer, Michigan to Michigan City, Indiana in violation of 18 U.S.C. § 2314. This offense occurred before DeGeratto joined the conspiracy. However, the coconspirators also violated 18 U.S.C. § 2314 when they transported the stolen turkeys from Michigan City, Indiana to the Roosevelt Road store in Chicago, Illinois the following morning. This offense occurred after DeGeratto joined the conspiracy. Count 3 only charges DeGeratto with this latter offense of transporting the stolen turkeys from Indiana to Illinois. The court therefore finds that DeGeratto was a member of the conspiracy when the substantive offense charged in Count 3 was committed.

The court concludes that the government has proved beyond a reasonable doubt the essential elements of the substantive offenses charged in Counts 3, 6 and 9 of the indictment. Furthermore, the court finds that the government has proved beyond a reasonable doubt that these substantive offenses were committed in furtherance of the conspiracy and that DeGeratto was a member of the conspiracy when these offenses were committed. Therefore, under *Pinkerton*, DeGeratto is guilty beyond a reasonable doubt of violating 18 U.S.C. § 2314 as charged in Counts 3, 6 and 9 of the indictment.

### Counts 4 and 7

■ Counts 4 and 7 charge DeGeratto with the possession of meat products stolen from interstate shipments in violation of 18 U.S.C. § 659.[6] Specifically, Counts 4 and 7

---

5. 18 U.S.C. § 2314 provides in relevant part:
   Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud

... Shall be fined not more than $10,000 or imprisoned not more than ten years, or both.
   \*   \*   \*   \*   \*   \*

6. 18 U.S.C. § 659 provides in relevant part:
   Whoever embezzles, steals, or unlawfully takes, carries away, or conceals, or by fraud or

pertain to the theft of the pork and processed meats in April of 1983 and to the theft of the assorted meat products in June of 1984, respectively. Under 18 U.S.C. § 659, the government must prove beyond a reasonable doubt that the meat products in each theft were stolen from an interstate shipment and that the persons possessing the meat products knew that the meat had been stolen. *See United States v. Zarattini*, 552 F.2d 753, 759–60 (7th Cir.1977), *cert. denied*, 431 U.S. 942, 97 S.Ct. 2661, 53 L.Ed.2d 262 (1977). The government proved that the pork and processed meats were on an interstate shipment traveling from Iowa to Maryland and that the assorted meat products were on an interstate shipment traveling from Iowa to Pennsylvania. *See* Government Exhibits 4 and 6. Consequently, the government has proved beyond a reasonable doubt the essential elements of the substantive offenses charged in Counts 4 and 7 of the indictment. Furthermore, the court finds that the government has proved beyond a reasonable doubt that these substantive offenses were committed in furtherance of the conspiracy and that DeGeratto was a member of the conspiracy when these offenses were committed. Under *Pinkerton*, the court concludes that DeGeratto is guilty beyond a reasonable doubt of violating 18 U.S.C. § 659 as charged in Counts 4 and 7 of the indictment.

## III. CONCLUSION

The court has reviewed the opinion of Judge Wood speaking for the Seventh Circuit in *United States v. DeGeratto*, 876 F.2d 576 (7th Cir.1989), the appeal from the first trial. A careful examination of that opinion causes this court to generally and somewhat simplistically conclude that Judge Wood was saying to the federal prosecutors that you had a good case and because of your excessive conduct, you blew it. Whether that is a fair generalization of what Judge Wood said and meant, there is no doubt that in the first trial the excessive zeal of the federal prosecutors caused the case to be reversed on due process grounds. No such prosecutorial misconduct or outrageous governmental conduct occurred in this trial.[7]

The court concludes that the government has proved beyond a reasonable doubt that DeGeratto was a knowing and willing participant in a conspiracy, the object of which was the interstate transportation and receipt of truckloads of stolen meat products. DeGeratto is therefore guilty beyond a reasonable doubt of violating 18 U.S.C. § 371 as charged in Count 1 of the indictment. Additionally, the court concludes that under the *Pinkerton* doctrine, DeGeratto is guilty beyond a reasonable doubt of violating 18 U.S.C. §§ 2312, 2314, and 659 as charged in Counts 2 through 9 of the indictment.

It is now ordered that this case be immediately referred to the probation officer of this court so that the sentencing procedures can go forward. This is not a sentencing guidelines case. Thus, sentencing

---

deception obtains from any pipeline system, railroad car, wagon, motortruck, or other vehicle, or from any tank or storage facility, station, station house, platform or depot or from any steamboat, vessel, or wharf, or from any aircraft, air terminal, airport, aircraft terminal or air navigation facility with intent to convert to his own use any goods or chattels moving as or which are a part of or which constitute an interstate or foreign shipment of freight, express, or other property; or

Whoever buys or receives or has in his possession any such goods or chattels, knowing the same to have been embezzled or stolen ... Shall in each case be fined not more than $5,000 or imprisoned not more than ten years, or both; but if the amount or value of such money, baggage, goods or chattels does not exceed $100,

he shall be fined not more than $1,000 or imprisoned not more than one year, or both.

\*    \*    \*    \*    \*    \*

7. To the extent that DeGeratto attempts to argue prosecutorial misconduct or outrageous governmental conduct at pages 37 and 38 of his supplemental brief, the court finds that there is no support for either proposition in the record of the trial of this case. The court also notes that in response to this court's questions during closing argument, counsel for DeGeratto indicated that no claim of governmental overreaching was being asserted in this second trial. For a recent relevant discussion of outrageous governmental conduct, see *United States v. Miller*, 891 F.2d 1265, 1267–1269 (7th Cir.1989); and *United States v. Sababu*, 891 F.2d 1308, 1326–1328 (7th Cir.1989).

is now set for South Bend, Indiana on February 23, 1990, at 1:30 p.m. IT IS SO ORDERED.