UNITED STATES of America,
Plaintiff–Appellee,

v.

Daniel DUNIGAN and John Berry,
Defendants–Appellants.

Nos. 88–2788, 88–2817.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 6, 1989.

Decided Sept. 8, 1989.

James R. Ferguson, Asst. U.S. Atty., Criminal Receiving, Appellate Div., Chicago, Ill., for plaintiff-appellee.

Carl P. Clavelli, Schiller Park, Ill., for Daniel Dunigan.

Luis M. Galvan, Office of the Federal Defender Program, Chicago, Ill., for John Berry.

John G. McKenzie, Asst. U.S. Atty., Rockford, Ill., for petitioner-appellee.

Before BAUER, Chief Judge, and EASTERBROOK and MANION, Circuit Judges.

BAUER, Chief Judge.

The appellants in this case are two civilians who were found by a jury to have participated in a surgical strike upon a supply building at the Glenview Naval Air Station: the objective of the mission was to steal factory sealed air conditioners being stored there. After a three day trial, the jury found Dunigan and Berry guilty of conspiring to steal the air conditioners, entering a United States building with intent to commit a theft, and knowingly converting United States property for their own use. We affirm.

## I. Background

In the early morning hours of November 22, 1983, a supply specialist at Glenview Navel Air base in Glenview, Illinois, called the sentry's station to report that the Public Works Center had been broken into. A subsequent investigation revealed that ten factory sealed air conditioners had been stolen from the building. Michael Seaman, a petty officer who was on duty as one of the sentries that evening, recalled seeing Don Allen, a jet mechanic shop supervisor, hastily leave the base in a Ford containing a large box in its trunk. Seaman recalled stating to the other sentry on duty, "if that T.V. falls out its mine." Allen was arrested the next day and agreed to cooperate in the investigation and prosecution of his cohorts.

At the appellants' trial, Allen testified that on the evening of November 21, 1983, Dunigan and Berry were waiting outside of his apartment in Dunigan's van. Dunigan asked Allen if he could provide them with an additional vehicle so that they could steal some air conditioners from the base. Dunigan sweetened the proposition by offering to cancel the $300 gambling debt Allen owed him if he participated. Allen agreed, but since his car was having mechanical problems, he borrowed his friend's Ford Torino. He followed Dunigan and Berry in the van to the Public Works Center. Allen testified that when they arrived, the door of the Center had already been broken into and two air conditioners were sitting outside the structure. Allen forced the door open further, and all three men loaded four air conditioners into the van and three into the Torino and took them to Dunigan's house. They then returned to the Center in the Torino and loaded up three more air conditioners, again taking them to Dunigan's house.

At that point, the three discussed "distribution or sale" of the goods. They agreed to load up the van with four air conditioners and travel to Chicago to Anthony Haywood's house in an attempt to hash out a sale. Upon arriving at Haywood's house, Dunigan and Berry waited in the van parked at the corner of 68th and Blackstone while Allen went upstairs to discuss the transaction. Soon thereafter, at approximately 3:30 a.m., Chicago Police Officers Thompson and Jones responded to a

radio dispatch concerning a van with two male occupants parked at the intersection. Officer Thompson testified that they pulled up to the corner facing the van and parked approximately ten feet in front of it. Dunigan and Berry then exited the van and met the officers halfway between vehicles. The officers requested that the two produce their driver's licenses and asked what they were doing in the area. Berry responded that they had given a friend from Kankakee a ride to Chicago to get some money, and that he was in one of the apartment buildings, but they were unsure which building it was. Nor were they able to tell the officers the last name of their friend.

While Officer Jones called in to check the status of Berry's and Dunigan's driver's licenses, Officer Thompson shined his flashlight through the front windshield of the van. He observed large cardboard boxes stacked behind the seats. At that point, Thompson walked over to the vehicle, opened the passenger door, and shined his flashlight into the back of the van. He saw that the boxes were labeled "Air Conditioner" and that they were still factory sealed. He then reached inside the van and pushed one of the boxes to test whether it was full. Thompson walked back over to Dunigan and Berry and inquired about the air conditioners. Dunigan told Thompson that he and Berry were subcontractors and that they had bought the air conditioners that day at an auction; they were en route to Kankakee to install them in a building they were working on. When asked if he had a receipt of purchase, Dunigan said he did not. When asked for proof that they were subcontractors, Dunigan said they had none.

Officer Jones responded by using his radio to inquire whether there had been any burglaries in the area. The dispatcher stated that although no burglaries had been reported, Dunigan's license was suspended. At that point, the Officers took Dunigan and Berry to the station in a paddy wagon for questioning. Meanwhile, Allen and Haywood watched from the safe

harbor of Haywood's apartment as the police drove off with their compatriots.

Dunigan and Berry were eventually released by the police without incident, and Allen and Haywood caught up with the two later that night at Dunigan's apartment in Glenview. Having regrouped, all four men proceeded to load four more air conditioners into the van and take them to Thomas Moses' apartment in Chicago. Moses was a friend of Haywood's who was willing to store the air conditioners in the basement of his apartment: Haywood had agreed to buy four of the air conditioners for $200 and offered to pay Moses $50 for storing them. Moses testified that after Dunigan and Berry haggled with Haywood over price, they helped to unload the air conditioners and put them in Moses' basement. Haywood then put a lock on the basement door. Moses recalled telling Haywood the next day that he had gotten "a steal of a deal," causing Haywood to smile in agreement.

The benefit of the bargain was fleeting, however, for Allen was arrested that very day. He confessed to his role in the theft and agreed to cooperate with both the police and Naval Investigative Service. Allen led navy investigators to Moses' basement, at which point four of the air conditioners were recovered. Police did not recover any air conditioners from Dunigan's apartment.

The Navy court-martialed Allen and sentenced him to sixty days hard labor, a bad conduct discharge, and a fine of $740 to compensate for the air conditioners which were not recovered. Moses pleaded guilty to a misdemeanor. Dunigan, Berry, and Haywood were indicted by a grand jury. The three-count indictment against Dunigan and Berry charged them with conspiring to steal the air conditioners in violation of 18 U.S.C. § 371, entering a United States building with intent to commit a theft in violation of both 18 U.S.C. § 13 and Ill.Rev.Stat.1987, ch. 38, ¶ 19–1, and knowingly converting United States property for their own use in violation of 18 U.S.C. § 641.[1]

---

1. Haywood was charged with conversion of gov-    ernmental property in violation of 18 U.S.C.

Before trial, Dunigan and Berry moved to suppress the statements and possible testimony of Officers Thompson and Jones. Defendants alleged that the officers unlawfully searched and seized their van. The trial court denied the motion after holding an evidentiary hearing and accepting the government's agreement not to present any evidence or testimony at or after the point that defendants were taken to the police station. At the conclusion of the trial that ensued, the jury found Dunigan and Berry guilty of all three counts.[2] The defendants timely filed a notice of appeal from the order of judgment.

## II. Analysis

Appellants emphasize that the crux of the government's case consisted of the testimony of Allen, their coconspirator, and Officer Thompson, who provided circumstantial evidence concerning the appellants' possession of the air conditioners and their placement at Haywood's apartment. That being said, they argue that the evidence was insufficient for the jury to find the defendants guilty (although appellants do not say so, we presume that they are raising this claim relative to each of the three counts). The gravamen of this claim is the appellants' contention that Allen's testimony must be discounted because it was incredible as a matter of law. In making this argument, appellants virtually ignore the veritable Maginot Line that stands between the credibility of witnesses at trial and an appellate court's role on review. Appellants seek to charge that line at its highest point: they do not clear the peak.

■ When assessing a general claim that the evidence at trial was insufficient to allow the jury to reach its verdict, we are constrained to review the evidence in the light most favorable to the prosecution. Our inquiry is limited to a determination of whether any rational trier of fact could have found the elements of the offense

charged beyond a reasonable doubt. *United States v. Whaley*, 830 F.2d 1469, 1472 (7th Cir.1987) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979)). The jury's verdict must stand unless "the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *United States v. Bruun*, 809 F.2d 397, 408 (7th Cir.1987). Our role is further limited when the credibility of a witness is at issue. This is a matter inherently within the province of the jury, and "absent extraordinary circumstances," this court will not reevaluate the testimony of a witness to determine his or her motives or other possible measures of reliability. *United States v. Garner*, 837 F.2d 1404, 1423 (7th Cir.1987).

■ When a conviction rests solely upon the uncorroborated testimony of an accomplice, we will uphold the verdict unless the accomplice's testimony is incredible as a matter of law. *United States v. Cravero*, 530 F.2d 666, 670 (5th Cir.1976). Appellants seem to be arguing that their conviction falls within this principle; however, it is clear that Allen's testimony is corroborated by the circumstantial evidence provided by both Officer Thompson and Moses. In any event, appellants are unable to show that Allen's testimony is legally "incredible."

■ To be incredible as a matter of law, a witness' testimony must be unbelievable on its face. In other words, it must have been either physically impossible for the witness to observe that which he or she claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all. *United States v. Garner*, 581 F.2d 481, 485 (5th Cir.1978). Mere inconsistencies in the witness' testimony do not render it legally incredible. *Id.* See also *United States v. Byrd*, 771 F.2d 215, 224 (7th Cir.1985). Notwithstanding this

---

§ 641. He waived his right to a jury and was tried before Judge Holderman, who found him not guilty.

**2.** Dunigan was sentenced to a period of two years incarceration on each count, to run con-

currently. Berry was sentenced to a work release program for a period of 90 days on count 1, and to a period of four years probation on each of the remaining counts, to run concurrently.

demanding standard, appellants argue that Allen's testimony is incredible because it is improbable that they would have committed their acts without apparent concern about their repeated ferries in and out of the naval base, or without attempting to conceal their unauthorized entry into the Public Works Center. They also offer what they claim is "an entirely more probable" scenario in which they are depicted as two unsuspecting civilians whom Allen was able to persuade to drive to Chicago with a van full of air conditioners. Our first response is that these propositions are internally inconsistent. At one level, they urge us to presume that appellants would have conducted their criminal acts in an intelligent manner. But if "military intelligence" is an oxymoron, surely "rational criminal conduct" must also be one which we need not accept on principle. Going the other way, appellants ask us to presume that they were a couple of easy marks who could be persuaded to drive their own van full of air conditioners to Chicago and back twice in one evening without any culpable knowledge or participation in the theft or subsequent fence. These arguments are possible theories of defense which should have been presented to the jury. They do not constitute grounds for finding that Allen's testimony was incredible as a matter of law.

Appellants' second claim on appeal is that the trial court erred when it denied their motion to suppress the testimony of Officer Thompson. They reassert their contention that because the officers conducted an unlawful search and seizure of the van, Officer Thompson's entire testimony should have been suppressed.

When the district court denied appellants' pretrial suppression motion, it summarized its factual findings and conclusions of law. The court found that the officers did not apprehend the parked van by stopping approximately ten feet in front of it; that the defendants consented to the officers' subsequent questioning by exiting the van, meeting the police officers half way between vehicles, and voluntarily answering their subsequent questions about why they were in the area; and that the officers did not act in any manner which might be considered coercive, such as displaying their weapons or patting down the defendants. In addition, the court stated:

I believe the officer did not violate any constitutional rights by inspecting further what he had seen in plain view, in that he walked to the passenger side of the van, saw the four large boxes, opened the door, and basically stepped into the van to push the boxes to see if they were full. And when he, I guess, determined that they were full, and also observed that they were factory sealed, it was appropriate to make inquiries of the defendants regarding the boxes.

At that point in time, again, there was no arrest. The statement in response to the question, the statement made by defendant Dunigan, that the air conditioners ... had been purchased at an auction, and that the air conditioners were being taken to Kankakee, that statement was not coerced in any way or obtained in any way by the police officers in violation of the defendants' constitutional rights.

■ We must rely on these findings of fact by the district court unless they are clearly erroneous. Similarly, "[a] district court's denial of a motion to suppress evidence will be affirmed on appeal unless it is clearly erroneous." *United States v. Grier*, 866 F.2d 908, 935 (7th Cir.1989) (quoting *United States v. D'Antoni*, 856 F.2d 975, 978–79 (7th Cir.1988)). Cf. *United States v. Fuesting*, 845 F.2d 664, 671–72 (7th Cir. 1988) (abuse of discretion applied). We have also recognized that a district court's determination whether a police-citizen encounter constituted a "seizure" is one that will generally rest upon a fact specific inquiry directly related to the credibility of the witnesses in each particular case. *United States v. Boden*, 854 F.2d 983, 991 (7th Cir.1988) (citing cases). Thus we owe this determination particular deference and will not disturb it unless the conclusion is clearly erroneous. *United States v. Espinosa–Alvarez*, 839 F.2d 1201, 1205 (7th Cir. 1987); *United States v. Black*, 675 F.2d 129, 135 (7th Cir.1982), *cert. denied*, 460

U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983).

■ In the present case, the court found that up until the time that the officers took appellants to the police station in a paddy wagon, their encounter on the street was a consensual one. A consensual encounter exists when "no restraint of the liberty of the citizen is implicated, [rather] the voluntary cooperation of the citizen is elicited through non-coercive questioning; this type of contact does not rise to a level of a seizure." *Black*, 675 F.2d at 133. Stated in other terms, a police-citizen encounter rises to the level of a seizure under the Fourth Amendment when a reasonable person under the surrounding circumstances would have believed that he or she was not free to leave. *Michigan v. Chesternut*, 486 U.S. 567, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (reaffirming test articulated in *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.)).

■ In light of these principles, we conclude that the district court did not commit clear error in finding that Dunigan and Berry consented to the initial questioning of the officers. The officers did nothing that could objectively lead Dunigan and Berry to believe that they were not free to leave, at least up until the point that the police discovered that Dunigan's license was suspended. If the appellants felt constrained prior to that point, it was because they had been sitting in a van filled with stolen air conditioners and they did not want to raise the suspicions or ire of the officers. As the appellants stood in front of the van and talked to the officers, Officer Thompson was able to see the air conditioner boxes in plain view with the use of his flash light.

■ Whether Officer Thompson subsequently had probable cause to enter the van and shake the boxes to test their contents is a closer question. To establish probable cause, a "police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably

warrant the intrusion." *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 1880, 20 L.Ed.2d 889 (1968). The totality of the circumstances in this instance include the fact that it was 3:30 a.m. when the officers received a radio dispatch that there were two suspicious men sitting in a van on the corner. It was a neighborhood with a high crime rate. When the police pulled up, the appellants proceeded to get out of their van and walk away from it toward the patrol car. When asked about their presence in the area, appellants offered a vague purpose for waiting there. They could not tell the police the last name of the friend they were waiting for, or which apartment he had gone into. The officers then saw the boxes in the back of the van. On balance, we believe that these facts gave Officer Thompson probable cause for believing that an offense had been or was being committed. Accordingly, we conclude that the district court properly rejected the motion to suppress.

■ The third issue which appellants raise on appeal is that their convictions for both burglary under Illinois law and theft of government property under 18 U.S.C. § 641 merged into one offense and could not be properly charged as separate counts. This argument has absolutely no merit. It is well settled that a single transaction can give rise to more than one conviction under differing statutes. *United States v. Allen*, 798 F.2d 985, 1000 (7th Cir.1986). When two distinct statutes are involved, the question is whether the statutes were "directed at separate evils." *Albernaz v. United States*, 450 U.S. 333, 334, 101 S.Ct. 1137, 1140, 67 L.Ed.2d 275 (1981). It is apparent from the face of the provisions that the Illinois burglary statute is directed at an evil quite apart from that which Congress sought to address through 18 U.S.C. § 641. *See generally United States v. Langdon–Bey*, 739 F.2d 1285, 1286–87 (7th Cir.1984). Moreover, the convictions are proper when analyzed under the test enumerated in *Blockburger v. United States*, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932). There, the Court held that the appropriate inquiry is whether each statute involved "requires proof of a fact that the other

does not." *Id.* at 304, 52 S.Ct. at 182. To prove burglary under the Illinois statute, the government was required to show that appellants entered a building without authority and with the intent to commit a theft. Theft of government property, on the other hand, requires proof that the appellants knowingly and intentionally stole or converted property belonging to the United States government. Under either approach, the appellants' convictions of the two counts under separate statutes was proper.

AFFIRMED.