**UNITED STATES of America**

v.

**Robert Dale STEELE, Defendant.**

**No. IP 91–105–CR.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

Jan. 28, 1992.

Timothy Morrison, Asst. U.S. Atty., Indianapolis, Ind., for plaintiff.

Jeffrey A. Baldwin, Baldwin Martenet & Clutter, Indianapolis, Ind., for defendant.

## ENTRY DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

TINDER, District Judge.

Defendant Robert D. Steele (Steele) moved to suppress evidence of a handgun seized from him on the evening of May 26, 1991 by Officer Roger Phillips (Phillips) of the Kokomo Police Department. Steele contends that he was seized and searched without a warrant or probable cause, and that the circumstances of the seizure did not fall within any of the recognized exceptions to those prerequisites. The government propounds a single argument in opposition to Steele's motion. The government argues that the encounter was voluntary; and, therefore, no fourth amendment seizure occurred. Because Steele was not seized until Phillips observed the shiny handgun in Steele's bag, Steele's Motion to Suppress will be denied.

## FINDINGS OF FACT

Steele did not testify at the hearing on the Motion to Suppress, so the Court must examine the encounter based on the version of the facts given by the testimony of the two police officers.

At about 9:15 p.m. on Sunday, May 26, 1991, Officer Phillips, a rookie member of the Kokomo Police Department, was on routine patrol at the wheel of a marked police car. Phillips was in full police uniform. Officer Kelvin Lynn Archer (Archer), a four-year veteran of the Kokomo Police Department, accompanied Phillips that night as a Field Training Officer, presumably to observe Phillips' performance and to back him up in the performance of his police duties. Archer was wearing what he referred to as "plain clothes."

Phillips and Archer travelled south along Home Avenue. They observed Steele

standing in front of a commercial building called the "Playhouse," which was on the west side of the street (right side of their vehicle). The officers believed that Steele was looking in the direction of their police vehicle. The Playhouse was closed on that evening, and the police had received reports of several burglaries at that business during Phillips' nine-month tenure with the Kokomo Police Department. Both Phillips and Archer testified that, because of these burglaries, they decided to stop and question the person seen by the shadows of the building. At this point, they had not identified the person as Robert Steele; however, apparently they believed that anyone near the closed building at this hour was suspicious enough to detain and question. Phillips drove beyond the Playhouse about one-half block and then turned back north on Home Avenue and pulled into the Playhouse parking lot.

As Phillips drove toward the Playhouse, Steele walked to the southeast side of the building, temporarily out of sight of the officers. Phillips maneuvered the patrol car so that it pointed southwest in the lot—aimed toward the southeast corner of the building. The patrol car stopped about thirty feet from the building. The Playhouse lot was not well lit; there were no other cars in the lot. Phillips turned on the halogen lights mounted on the roof of the patrol car. These lights were not the flashing red or blue lights traditionally used by police to signal a warning or to indicate a stop command; they were lights used solely to illuminate an area in need of additional lighting.[1]

As the patrol car stopped in the parking lot, Steele returned to the front side of the Playhouse. Steele walked toward the police car without saying anything and without making any significant gestures. Phillips opened his car door, leaned out and told Steele to "stop right there." Phillips made his statement to Steele in an ordinary tone of voice, unaided by a megaphone or other method of amplification. Steele complied immediately; at that point he was directly in front of the car, about fifteen feet away. The patrol car's overhead halogen lights illuminated Steele and provided the officers a good view of him.

While Phillips approached Steele, Archer exited the passenger side of the car and remained near the vehicle. Neither officer displayed his firearm; Phillips carried a large police flashlight. Phillips and Steele stood in the illuminated area and faced each other directly. Phillips asked Steele what he was doing; Steele replied that he was on his way home and felt the urge to urinate, which he had done on the side of the Playhouse building. Both officers' testimony described Steele's demeanor as cooperative and pliant. Phillips asked Steele for identification; Steele handed Phillips a New Jersey driver's license.[2]

During this exchange, Phillips observed that Steele carried a black pouch on his right hip. Steele had his right hand on the pouch and appeared to be pushing the pouch to the rear—as though he did not want it to be in the officers' line of sight. Phillips asked Steele what was in the pouch, to which Steele replied "just clothes." Without further prompting, Steele opened the pouch and pulled out a T-shirt to display to Phillips. When Steele pulled out the shirt, Phillips saw into the pouch and observed the glint off a shiny steel handgun in the bottom of the bag. Phillips then saw the gun itself. After seeing the gun, Phillips directed Steele to remove the bag from his side. Steele complied and Phillips seized the gun and unloaded it. The gun is the evidence upon

---

**1.** It is unclear whether other of the patrol car's lights (e.g., headlights or side-mounted spotlight) were in operation while the car was parked. But the Court will assume that at least the headlights were on as well, because of the time of night and the absence of evidence indicating that Phillips was either operating the vehicle without headlights or that he turned them off upon pulling into the lot.

**2.** Up to that point, Phillips had not recognized Steele. When Phillips saw the license, he thought that he might have heard of Steele, but this point was collateral and not developed at the hearing. The government does not claim recognition of Steele, either upon initial observation or subsequently, as a justification for the stop.

which the indictment is based and the evidence subject to Steele's Motion to Suppress.

Phillips testified that he told Steele to stop in front of the car because that location provided a good vantage point for the officers' protection. He testified that he did not have any specific reason to fear Steele at this point in the encounter; but, general police procedures dictate that caution be exercised. Both officers testified that if Steele would not have complied with Phillips' command to stop, then the officers would have further compelled him to stop. Phillips testified that he would not have allowed Steele to leave even after Steele produced his license, although Phillips was not prepared to make an arrest at that time.

Steele never told the officers that he did not want to talk to them; he never asked for an attorney or whether he was free to leave. Phillips did not inform Steele that Steele did not have to stay and did not advise Steele that he was not required to answer questions. Archer confirmed Phillips' view of the situation and Phillips' verbal communications with Steele, adding only that the decision to detain Steele had been made after he was spotted and before the encounter in front of the police car. Archer was not able to see the gun before its seizure, because of his limited view from the passenger side of the car. Archer remained by the patrol car and said nothing to Steele during the encounter.

As the Discussion section below concludes, the main fact to be determined by the Court is whether, based upon all the circumstances of the encounter, a reasonable person in Steele's position would have felt free to break off contact with the police and proceed unimpeded about his own affairs. Based upon the evidence produced at the hearing, this Court finds that a reasonable person in Steele's position would have felt free to leave.[3]

## DISCUSSION AND CONCLUSIONS OF LAW

The government contests Steele's Motion to Suppress based solely on the strength of its argument that the encounter between Steele and the officers was not a seizure. At the hearing, and in its documents filed in opposition to Steele's Motion, the government declined to argue that the officers had the requisite suspicion to stop Steele and compel him to answer their questions.[4] Thus, the sole issue presented is whether the officers "seized" Steele *prior* to the point that Officer Phillips saw the handgun in Steele's pouch and arrested him.[5]

▮ The fourth amendment provides that "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV. To suppress evidence of the handgun found on his person, Steele must prove that the government violated the fourth amendment in the process of obtaining that evidence from him. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In most cases, the primary focus is upon the *order*

---

3. The Seventh Circuit reviews for clear error a district court finding regarding whether a reasonable person felt free to leave; because it is essentially fact bound and based in part upon the demeanor of witnesses, the decision will stand unless it is clearly erroneous. *United States v. High*, 921 F.2d 112, 114 (7th Cir.1990); *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir.1990), *cert. denied*, — U.S. —, 111 S.Ct. 764, 112 L.Ed.2d 783 (1991); *United States v. Sterling*, 909 F.2d 1078, 1082 (7th Cir.1990); *United States v. Edwards*, 898 F.2d 1273, 1276 (7th Cir.1990). Thus, the Seventh Circuit has suggested repeatedly that the district court make a specific finding of fact regarding the ultimate factual issue. *Sterling*, 909 F.2d at 1082.

4. At the hearing, the Court asked the government whether it was arguing that the officers had a reasonable suspicion to stop and question Steele. The government stated affirmatively that it was not pursuing that line of argument; consequently, the government attempted to introduced no additional evidence directed toward establishing articulable facts giving rise to a reasonable suspicion to allow the officers to detain Steele lawfully.

5. There is no colorable doubt that Steele was seized (lawfully) at the point Officer Phillips observed the handgun and requested that Steele set down the pouch and hand the weapon to him; therefore, the concern is with the nature of the encounter preceding that moment.

of two events: (1) when reasonable suspicion developed, and (2) when the seizure occurred.[6] If a seizure is effected prior to the occurrence of facts creating a reasonable suspicion "justifying" the seizure, then the seizure is contrary to law.

In this matter, the government implicitly concedes that any seizure of Steele's person prior to the time Phillips saw the gun would be "unjustified." Thus, the only question is whether Steele had been "seized" prior to this time; if Steele was not seized, then there can be no fourth amendment violation and no basis for suppression. The threshold question is if and when a seizure occurred. *United States v. Jaramillo*, 891 F.2d 620, 625 (7th Cir.1989), *cert. denied*, 494 U.S. 1069, 110 S.Ct. 1791, 108 L.Ed.2d 792 (1990); *United States v. Teslim*, 869 F.2d 316, 321 (7th Cir.1989); *United States v. Borys*, 766 F.2d 304 (7th Cir.1985), *cert. denied*, 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 893 (1986).

■ Steele bears the burden of proving by a preponderance of the evidence that he was seized during his encounter with Officer Phillips. *See United States v. Matlock*, 415 U.S. 164, 177, 94 S.Ct. 988, 996, 39 L.Ed.2d 242 (1974) (preponderance standard); *United States v. Feldman*, 606 F.2d 673 (6th Cir.1979) (burden on party moving to suppress). A typical motion to suppress evidence based upon an unlawful seizure involves a shifting burden; the defendant bears the burden of proving there was a seizure and then the burden shifts to the government to prove the seizure was justified (reasonable). *See United States v. Wheeler*, 800 F.2d 100, 102 (7th Cir.1986) (government must prove reasonable suspicion existed); *United States v. Longmire*, 761 F.2d 411, 417 (7th Cir.1985) (government must prove legality of *Terry* stop). As with any alleged wrong, the claimant must first provide a basis for finding that the wrongdoer was in a position to commit the alleged wrongful conduct; then, the wrongdoer has the burden of refuting or providing an excuse of justification. As in cases involving consent to search or involving a reasonable person's expectation of privacy in an area searched, the defendant bears the initial burden of showing that a constitutional right is implicated. *Rakas v. Illinois*, 439 U.S. 128, 130–31 n. 1, 99 S.Ct. 421, 423–24 n. 1, 58 L.Ed.2d 387 (1978) (defendant must establish invasion of privacy); *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960) (defendant must establish reasonable expectation of privacy).

Evidence allegedly constituting a seizure is not "solely or particularly within the knowledge and control of the officers," *Longmire*, 761 F.2d at 417, unlike evidence of facts constituting reasonable suspicion. That reason, which supports placing the burden on the government to prove the *reasonableness* of an established stop, has a contrary application in this context. Under the current "reasonable person" test for a seizure,[7] the defendant has the proper perspective to provide facts from which to establish whether the defendant was seized. It would be illogical to require the government to prove, from their inferior perspective, that a person was *not* seized. In this matter, the sole issue is whether a seizure occurred; therefore, Steele bears the burden of proving that the officers' conduct implicated the fourth amendment by seizing his person.

■ The fourth amendment does not prohibit all police conduct that some may find offensive or ineffective. Although some may find the mere presence of police officers somewhat confining, the law is clear that police enjoy the rights of every citizen to move about freely in public.

> [L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or

---

**6.** The Seventh Circuit stated the matter succinctly in *United States v. Black*, 675 F.2d 129, 132 (7th Cir.1982), *cert. denied*, 460 U.S. 1068, 103 S.Ct. 1520, 75 L.Ed.2d 945 (1983): "Analysis of this issue breaks down into two questions: was the defendant seized, and if so at what point; and, if the defendant was seized, was there

objective justification sufficient to create reasonable suspicion that the defendant was engaging in criminal activity."

**7.** See discussion of the test at pages 1306–1308, *infra*.

in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions.

*Florida v. Royer,* 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983) (plurality opinion); *United States v. Cardona–Rivera,* 904 F.2d 1149, 1153 (7th Cir.1990) (police may "accost and ask to speak with a person without any grounds at all.").

Obviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has restrained the liberty of a citizen may we conclude that a "seizure" has occurred.

*Terry v. Ohio,* 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). The obvious corollary to the officers' freedom of movement is that if an officer does not have sufficient suspicion to detain a person, then the person is always free to ignore questions put to him or her and go on his or her way. *Id.* at 32–33, 88 S.Ct. at 1885–86 (Harlan, J., concurring); *id.,* at 34, 88 S.Ct. at 1886 (White, J., concurring).

■ Contemporary fourth amendment jurisprudence has defined three distinct categories of encounters involving the police and the public. The first category is an arrest. A police officer may formally or informally arrest an individual; but, prior to arresting a person, the police must have probable cause to believe the person has committed a crime. The second type of coercive encounter is labelled a "detention," which is a brief seizure to dispel or confirm a reasonable suspicion that the detainee has committed or is about to commit a criminal act. There are "stop and frisk" detentions and "stop and question" detentions. Police may stop and frisk for a suspect for weapons, *Terry;* and, a reasonable suspicion of criminal activity warrants a temporary seizure for the purpose of questioning the suspect, limited to the purpose of the stop. *United States v. Brigno-*

*ni–Ponce,* 422 U.S. 873, 881–82, 95 S.Ct. 2574, 2580–81, 45 L.Ed.2d 607 (1975). The third type of police-citizen encounter is commonly called "voluntary" or "consensual"; [8] these terms are intended to cover all encounters that do not involve a coercive seizure by the police.

■ Two elements determine whether and at what point an encounter involves a seizure. The initial element, somewhat axiomatic, requires that a person actually submit to or be within the control of the police before the person is seized. *United States v. Hodari D.,* —— U.S. ——, 111 S.Ct. 1547, 1551–52, 113 L.Ed.2d 690 (1991) (subject must yield to officer's "show of authority" to constitute a seizure). This threshold element is satisfied in this matter, because Steele remained still at the direction of Officer Phillips and stood before him at precisely the place requested.

■ The second necessary element of a seizure requires that the person be coerced, "by physical force or show of authority," to remain and speak with the officer. The legal standard for determining whether an encounter is voluntary or a seizure is stated often and consistently. Whenever an officer restrains the freedom of a person to walk away from the officer, the officer has seized that person. *Tennessee v. Garner,* 471 U.S. 1, 7, 105 S.Ct. 1694, 1699, 85 L.Ed.2d 1 (1983) (citing *Brignoni–Ponce,* 422 U.S. at 878, 95 S.Ct. at 2578). A single test is applicable to all cases: A person is seized when the particular police conduct occurring in the particular setting prompts a reasonable person to conclude that he or she is not free to leave the officer's presence. *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988); *INS v. Delgado,* 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984); *Royer,* 460 U.S. at 502, 103 S.Ct. at 1326 (plurality opinion); *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (plurality opinion). A seizure occurs when an officer requires a person to remain in a particular place (*Michigan v. Summers,*

---

**8.** The term "consensual" has unfortunate connotations, because an encounter may be a non-

seizure, regardless whether a person has given affirmative consent to speak with an officer.

452 U.S. 692, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1881)), or when an officer requires the person to accompany the officer to a different place. *Pennsylvania v. Mimms*, 434 U.S. 106, 116 n. 2, 98 S.Ct. 330, 336 n. 2, 54 L.Ed.2d 331 (1977) (seizure occurred when officers ordered person out of his car); *Royer*, 460 U.S. at 494, 103 S.Ct. at 1322 (plurality opinion) (officers required traveler to accompany them to a side room away from the public).

■ Thus, a seizure occurs when a person is "required" to submit to an officer's control. When does an officer "require" a person to move or remain? That is, what types of police behavior are recognized as sufficiently restraining or coercive to conclude that the officer has seized the person? There are two general categories of police conduct that may be sufficiently restraining to constitute a seizure. A person may be seized by means of "physical force," or by means of an officer's "show of authority." These two general categories, first propounded in *Terry*, have been illustrated by numerous subsequent opinions involving varying factual situations.

Seizure by physical force is usually not difficult to assess. An officer may seize a person by direct physical contact—a literal "apprehension." *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979). This occurs when a person is closed into a confined area, handcuffed, or when an officer physically touches the person to restrain his or her movement. *United States v. Santillanes*, 848 F.2d 1103, 1106 (10th Cir.1988). Other direct physical touching, like in a pat down search, is also a seizure. *Jaramillo*, 891 F.2d at 624; *but see Pliska v. City of Stevens Point*, 823 F.2d 1168 (7th Cir.1987) (officer's hand on defendant's shoulder, used to guide defendant to rear seat of patrol car is not a seizure).

Sufficient restraint may exist if an officer physically blocks a person's path of exit. For example, a patrol car making U-turn into a person's driveway and blocking the person's path to the street is a seizure. *United States v. Kerr*, 817 F.2d 1384, 1387 (9th Cir.1987). A person in his automobile, which was bounded on three sides by police vehicles, was not physically able to leave, so the encounter was a seizure. *United States v. Pavelski*, 789 F.2d 485, 488–89 (7th Cir.), *cert. denied*, 479 U.S. 917, 107 S.Ct. 322, 93 L.Ed.2d 295 (1986); *United States v. Perate*, 719 F.2d 706, 709 (4th Cir.1983); *see also United States v. Zukas*, 843 F.2d 179, 182 (5th Cir.1988), *cert. denied*, 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1989) (patrol car parked in front of private airplane).

An officer's physical act of retaining a person's travel documents, identification card, or other item of value is also sufficient to constitute a seizure. *Royer*, 460 U.S. at 501, 103 S.Ct. at 1326 (plurality opinion) (airline tickets); *United States v. Guzman*, 864 F.2d 1512, 1519–20 (10th Cir. 1988) (continued questioning after routine traffic stop were not part of voluntary encounter because officer had not returned driver's license); *United States v. Cordell*, 723 F.2d 1283, 1285 (7th Cir.1983), *cert. denied*, 465 U.S. 1029, 104 S.Ct. 1291, 79 L.Ed.2d 693 (1984) (travel ticket); *United States v. Woods*, 720 F.2d 1022, 1026 (9th Cir.1983) (taking of airline ticket "clear objective indication that [defendant] was being temporarily detained"); *United States v. Thompson*, 712 F.2d 1356, 1359–61 (11th Cir.1983); *but see United States v. Campbell*, 843 F.2d 1089, 1093 (8th Cir.1988) (dicta discussing that defendant would feel free to leave behind used airline ticket and state identification card).

There is no doubt that an officer also may seize a person without using actual physical restraint; a seizure may be effected solely by an officer's "show of authority." *Mendenhall*, 446 U.S. at 554, 100 S.Ct. at 1877 (plurality opinion); *Royer*, 460 U.S. at 501, 103 S.Ct. at 1326 (plurality opinion). Even without physical contact, the "circumstances of the encounter [may be] *so intimidating* as to demonstrate that a reasonable person would have believed he was not free to leave if he had not responded...." *Delgado*, 466 U.S. at 216, 104 S.Ct. at 1762 (emphasis added). If the police conduct "convey[s] a *message* that compliance with their requests is required," then the encounter is a seizure. *Florida v.*

*Bostick,* —— U.S. ——, 111 S.Ct. 2382, 2386, 115 L.Ed.2d 389 (1991) (emphasis added). A court must step into the shoes of the defendant and determine from a common, objective perspective whether the defendant would have felt free to leave.[9]

There is no bright-line rule applicable to determine what types of police activity provide a sufficient "show of authority" to constitute a seizure. *Bostick,* 111 S.Ct. at 2389; *Chesternut,* 486 U.S. at 573, 108 S.Ct. at 1979. Whether police conduct in these instances amounts to a seizure must take into account " 'all of the circumstances surrounding the incident' " in each individual case. *Delgado,* 466 U.S. at 215, 104 S.Ct. at 1762 (quoting *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877 (plurality opinion)). "This test is necessarily imprecise, because it is designed to assess the coercive effect of police conduct, taken as a whole, rather than to focus on particular details of that conduct in isolation." *Chesternut,* 486 U.S. at 573, 108 S.Ct. at 1979. Recently, the Supreme Court has directed clearly that

> a court must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter.

*Bostick,* 111 S.Ct. at 2389. The "determination of precisely when an officer's polite request for an interview rises to the level of a show of authority sufficient to constitute an investigative stop is 'not always an easy one,' may be 'extremely close,' and calls for a 'refined judgment' by the trial court." *Black,* 675 F.2d at 135 (citations omitted).

Courts have held that certain types of authoritative police conduct is inherently "so intimidating" that it will usually (but not always) effect a seizure. For example, an encounter during which an officer draws a weapon is usually considered a seizure. Also, a seizure may occur when an officer takes the person aside and informs the person that he or she is the target of an investigation. *United States v. Palen,* 793 F.2d 853, 857 (7th Cir.1986) (statement that defendant was suspected of carrying narcotics ripened questioning into an investigatory stop). Statements which "intimate that an investigation has focussed on a specific individual easily could induce a reasonable person to believe that failure to cooperate would only lead to formal detention." *United States v. Berry,* 670 F.2d 583, 597 (Former 5th Cir. Unit B 1982) (en banc). Thus, a seizure occurred when officer had defendant's ticket and "took [the defendant] aside and informed him that he was suspected of carrying narcotics." *United States v. Hanson,* 801 F.2d 757, 761 (5th Cir.1986); *United States v. Nunley,* 873 F.2d 182, 184–85 (8th Cir. 1989) (consensual airport conversation became detention when officer told traveller that officers were there to stop flow of drugs through airport); *United States v. Sadosky,* 732 F.2d 1388, 1392 (8th Cir.1983) *cert. denied,* 469 U.S. 884, 105 S.Ct. 254, 83 L.Ed.2d 191 (1984); *but see United States v. Morgan,* 725 F.2d 56, 57 (7th Cir.1984) (statement that person under suspicion may not be enough to constitute seizure).

A police officer's verbal command—if heeded—is often sufficient to seize a person. Indeed, it is hoped that this method is the most common and effective means to effect detention or arrest. The authority of an officer to issue binding verbal commands is unquestioned; therefore, a person may be detained without any immediate physical restraint present. Two officers' commands to "stop," after one of the officers illuminated "fleeing" suspects with a flashlight, constituted a seizure in *United States v. Peoples,* 925 F.2d 1082, 1087 (8th Cir.), *cert. denied,* —— U.S. ——,

---

9. Note that the test is whether a reasonable person "would have" felt free to leave, not whether a reasonable person "could have" felt free to leave. Thus, the defendant must prove by a preponderance of the evidence that it was more likely than not that a reasonable person would have felt free to leave. The mere possibility that the defendant could escape (remember *Hodari D.*) or could leave without incident is an insufficient ground to reject a defendant's contention.

112 S.Ct. 370, 116 L.Ed.2d 322 (1991). An officer's statements directing a person to accompany the officer for questioning is similarly coercive and constitutes a seizure. *United States v. Knox,* 839 F.2d 285, 289 (6th Cir.), *cert. denied,* 490 U.S. 1019, 109 S.Ct. 1742, 104 L.Ed.2d 179 (1988); *United States v. Jefferson,* 650 F.2d 854, 856 (6th Cir.1981). When asked to accompany an officer to a different location, a reasonable person would not believe he or she was free to leave. *Knox,* 839 F.2d at 289. The coercive message communicated by police sirens or flashing patrol car lights is similar to an explicit verbal command. *Hodari D.,* 111 S.Ct. at 1552; *Brower v. Inyo County,* 489 U.S. 593, 596, 109 S.Ct. 1378, 1381, 103 L.Ed.2d 628 (1989) (patrol car with flashing lights sufficient show of authority); *Kerr,* 817 F.2d 1384; *United States v. Ward,* 488 F.2d 162, 169 (9th Cir.1973) (en banc).

Officer Phillips did not grab Steele, block his path of egress, or retain something of value from him: There was no actual physical seizure.[10] Neither officer drew a weapon at any point during the encounter. However, the officers'[11] conduct and the setting in which it occurred must be examined to determine whether "a reasonable person would have believed that he was not free to leave" because of the message conveyed by the officers' "show of official authority."

■ Steele does not dispute the officers' testimony that Steele came out from the side of the Playhouse and began walking toward the patrol car prior to any statement or command by officers. Steele walked directly toward the patrol car; therefore, it appears that he was not intent on walking past it. However, the apparent voluntary nature of Steele's initial act does not preclude the possibility that he was seized at some later point during the en-

counter. A detention may occur at any stage of an encounter between the police and the public. Just as any element of the conduct/setting mix may provide the final fact necessary to establish reasonable suspicion, a single event may change the legal character of police-citizen intercourse. At any point, an encounter that may have been consensual initially, may become a seizure if the person reasonably believes that he is not free to end the conversation and proceed on his way. *Mendenhall,* 446 U.S. at 555, 100 S.Ct. at 1877 (plurality opinion); *United States v. Werking,* 915 F.2d 1404, 1409 (10th Cir.1990); *Nunley,* 873 F.2d at 185; *Pliska,* 823 F.2d at 1176; *Palen,* 793 F.2d at 857. Conversely, even after an investigative stop (a seizure) has concluded, an officer's continued questioning of a person may be consensual if a reasonable person would no longer have felt detained. *United States v. Turner,* 928 F.2d 956, 959 (10th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 230, 116 L.Ed.2d 187 (1991); *Werking,* 915 F.2d at 1408 (investigative stop concluded license and registration returned; questions following return of papers were not part of any seizure).

■ Certain police activities are in themselves so routine or non-threatening that courts have held that a reasonable person would not feel coerced by them alone. For example, an officer may request to speak with anyone; even if the request is not prefaced by an officer's statement that the answers are voluntary, these questions are not seizures. *Bostick,* 111 S.Ct. at 2386; *Mendenhall,* 446 U.S. at 554, 100 S.Ct. at 1877 (plurality opinion); *Royer,* 460 U.S. at 497, 103 S.Ct. at 1324 (plurality opinion). Similarly, merely asking a person for identification, other documents or items is permissible, absent oth-

---

**10.** The government submitted an exhibit (Government's Ex. 1), which provided a rough drawing of the Playhouse building and the two lots adjacent to it. No evidence introduced at the hearing supported an inference that the encounter took place anywhere other than in a wide-open area of the lots. Thus, Steele was not "pinned in" by the officers' physical presence or the location of the patrol car.

**11.** Technically, the encounter involved two officers, Phillips and Archer; but, Phillips was the only officer who had direct contact with Steele. Thus, this Entry will occasionally speak of "an officer's" conduct (Phillips) or more generally "the officers'" conduct (both) when appropriate.

er factors. *Delgado*, 466 U.S. at 216, 104 S.Ct. at 1762; *Royer*, 460 U.S. at 501, 103 S.Ct. at 1326 (plurality opinion); *Sterling*, 909 F.2d at 1082; *Black*, 675 F.2d at 136.[12]

■ An officer's adornments of authority are not in themselves sufficient to constitute a seizure when displayed to a reasonable person. Therefore, merely showing the person a badge or identifying one's self as an officer does not constitute a seizure. *Royer*, 460 U.S. at 497, 103 S.Ct. at 1324 (plurality opinion); *Mendenhall*, 446 U.S. 544, 555, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (plurality opinion); *United States v. Valdiosera–Godinez*, 932 F.2d 1093, 1099 (5th Cir.1991); *Morgan*, 725 F.2d at 59. The presence of a nearby patrol car is not in itself sufficiently intimidating to constitute a "show of authority" seizing a pedestrian being questioned by officers on foot. *United States v. Locklin*, 943 F.2d 838, 839 (8th Cir.1991). Recently, the Supreme Court held that a patrol car driving in "silent" pursuit of a running pedestrian is not in itself "so intimidating" to constitute a seizure. *Chesternut*, 486 U.S. at 575–76, 108 S.Ct. at 1980–81.

■ Unlike the law governing an arrested person's consent to speak with authorities (so-called *"Miranda* warning"), there is no bright line rule regarding statements made by officers or the public during an encounter. Whether a person has been seized during an encounter does not turn solely upon whether an officer advised the person that he or she was free to leave or whether the person asked to leave. *Bostick*, 111 S.Ct. at 2388. Although an officer's statement that the person is free to leave makes matters clearer, an encounter may be consensual even though the officer does not communicate this to the person. *Mendenhall*, 446 U.S. at 555, 100 S.Ct. at 1877 (plurality opinion); *see also High*, 921 F.2d at 115 (stating that such a statement would be very helpful in airport encoun-

ters, but refusing to adopt *Miranda*-like rule for consensual encounters).

There was no verbal exchange between Steele and Officer Phillips regarding the nature of their intercourse. Officer Phillips did not tell Steele that Steele was the target of any investigation. At the hearing, the officers testified that Officer Phillips never told Steele that he was free to leave or that Phillips "requested" to speak with Steele. The officers also testified that Steele did not ask Phillips whether Steele was free to leave if he refused to answer questions. Whether a seizure occurred must be determined in light of the actors' silence on this matter, rather than their affirmative statements.

■ The fourth amendment proscribes police conduct, not police thoughts or intentions; therefore, an officer's subjective intent to detain a person is in itself irrelevant. "Of course, the subjective intent of the officers is relevant to an assessment of the Fourth Amendment implication of police conduct only to the extent that intent has been conveyed to the person confronted." *Chesternut*, 486 U.S. at 575 n. 7, 108 S.Ct. at 1980 n. 7; *Mendenhall*, 446 U.S. at 554 n. 6, 100 S.Ct. at 1877 n. 6 (plurality opinion); *United States v. Pena*, 920 F.2d 1509, 1516 (10th Cir.1990), *cert. denied,* — U.S. —,. 111 S.Ct. 2802, 115 L.Ed.2d 975 (1991) (uncommunicated plan irrelevant to issue whether defendant was "in custody"); *Nunley*, 873 F.2d at 185; *Woods*, 720 F.2d at 1026; *Williams v. United States*, 381 F.2d 20, 22 (9th Cir.1967); *see also* 3 W. LaFave, Search and Seizure § 9.2, p. 407 (2d ed.1987 and Supp.1991) (uncommunicated intent irrelevant). Thus, the officers' testimony that they had decided to stop Steele immediately upon seeing him, and that they would have compelled him to remain and answer their questions, does not itself resolve the seizure issue. However, this fact and the officers' demeanor at the hearing may support inferences the Court may draw regarding the officers'

---

**12.** But note that a recent decision by the Fourth Circuit has held that repeated "requests" for consent to search a traveller's effects may become a seizure. *United States v. Wilson*, 953 F.2d 116 (4th Cir.1991); *see also High,* 921 F.2d at 116 ("[officers'] questioning was not repetitive, intense or threatening.").

posture and conduct during their encounter with Steele.

■ Against the legal framework discussed above, the Court must determine whether the officers seized Steele prior to the time Officer Phillips seized the handgun and arrested Steele. The lengthy previous discussion attempts to parse what things are or are not relevant in determining the sole issue: whether a reasonable person in Steele's position would have felt free to break off contact with the officers and go about his affairs with the reasonable belief that he would not be compelled to remain. Would Steele have been reasonable to believe he would be detained if he "simply refused to answer" (*Delgado*, 466 U.S. at 218, 104 S.Ct. at 1763) or chose "to disregard the police and go about his business?" *Bostick*, 111 S.Ct. at 2386 (*quoting Hodari D.*, 111 S.Ct. at 1551).

The totality of the circumstances—the setting and the officers' conduct—derived from the evidence produced at the hearing, indicates that Steele was not seized prior to his arrest. It is conceivable that the encounter between Steele and the officers may have involved a seizure; however, based upon the thin record developed by the Defendant at the hearing, such a finding of fact would involve too many unsupported inferences. Thus, although this encounter occurred in a location more isolated than that of a typical airport questioning, the Defendant has failed to meet his burden of proving that he was more likely than not seized prior to his arrest.

Looking at the encounter from the viewpoint of a reasonable person in Steele's position, Officer Phillips' conduct was not objectively threatening or coercive. The patrol car pulled into the lot and illuminated Steele with its overhead lights. Steele, voluntarily approaching the vehicle, then heard Phillips say "stop right there." At the hearing, Steele failed to develop several important facts that may have tipped the evidence in his favor.

There was no testimony about the manner in which Officer Phillips brought the car into the lot. If Phillips made a rapid U-turn and sped up or squealed his tires or turned on the siren or flashing lights, then these facts would make the approach much more objectively coercive. There is no fact in evidence about the intensity of the patrol car lights. Moreover, any fact about the manner in which Officer Phillips' made the statement to "stop" met a similar fate. The officers testified that Phillips used a normal tone of voice in telling Steele to stop; Phillips told Steele to stop there because it was a well-lighted area.[13] Phillips' tone may have conveyed to a reasonable person that Steele was merely to approach no closer, not that Steele was to remain at a particular place. On the witness stand, Officer Phillips was not asked to attempt to duplicate the manner in which he made that statement. If the hearing had developed facts that the statement was an unmistakable *command* to stop, then this Court's fact-bound finding may be different.[14]

Few decisions concerning seizures of the person have involved encounters outside of major travel terminals. The majority of cases involve encounters between airport travelers and drug enforcement officers,

---

13. In theory, Phillips' subjective intent in making the statement is itself irrelevant—just as an officer's intent to detain someone is irrelevant in the face of an objective view of his conduct. However, because the Defendant failed to develop facts that would indicate otherwise, the Court may draw the logical inference that Phillips' tone reflected his stated purpose in making the statement.

14. Other relevant facts were also undeveloped. Courts draw very broad inferences about the facts that may give an officer reasonable suspicion of wrongdoing; a court ought to draw similar inferences about the facts known by a reasonable pedestrian. Thus, a reasonable person in Steele's position *may* have known that he was trespassing near a closed business and *may* have known that the business had been the site of recent burglaries. If these facts had been developed at the hearing, they would be relevant, because a reasonable person in an objectively suspicious setting would have greater reason to believe he was being seized than would a person in a non-suspicious setting. Of course, a particular defendant's subjective knowledge of how suspicious his (undisclosed) conduct might be—like whether he was carrying an unregistered handgun—is irrelevant; the focus is upon what the allegorical reasonable person would know if placed in the same setting.

who are trained specifically to work the grey area between coercive and consensual conversations. In contrast, this case involves a nighttime encounter between a pedestrian and two officers making a U-turn to approach him in their patrol car. This Court does not have the benefit of prior decisions developing patterns from similar encounters. Regardless, the Court is not convinced by the evidence presented that a reasonable person in Steele's position would not have felt free to leave.[15]

The government argues that the Steele case may be resolved under *United States v. Dunigan*, 884 F.2d 1010 (7th Cir.1989). In *Dunigan*, the defendants exited their van after a police vehicle approached; the defendants and officers met on foot between the vehicles. Although that case involved a nighttime encounter between pedestrians, *Dunigan* is distinguishable because of the substantially differing facts. In *Dunigan*, the officers did not request that the defendants stop; and, it appears that the patrol car's overhead halogen lights were not illuminated at the time the officers met with the defendants.[16] *Dunigan* does not stand for the principle that nighttime pedestrian encounters are not seizures. As each case rises and falls on its own facts, the *Dunigan* case is not instructive on the facts presented here.

A recent Eighth Circuit decision provides an interesting and pertinently contrasting set of facts. *Peoples*, 925 F.2d 1082. That encounter occurred in the evening between patrol officers and pedestrians. After receiving an anonymous call about suspicious persons, the officers saw them on a public walkway and approached the subjects from two different directions. One officer shined a spotlight on the subjects, and then identified himself as an officer. The subjects turned from him and began walking

quickly away; both officers, with weapons drawn, then ordered the subjects to stop. The court concluded that

> the seizure of Peoples and the other suspects occurred when the officers ordered Peoples and Skinner to stop. At this moment, there was a clear order for the suspects to submit to the officers. The order was given after Officer Johnson shined his spotlight on the entire area, and both officers began asserting the order from different directions.

*Id.* at 1085.

The *Peoples* case is also distinguishable from the evidence presented in this matter, because the officers there were unambiguously commanding fleeing persons to stop. The officers were converging from either side and had their weapons drawn. A reasonable person would not think these officers wished to have a social chat. In contrast, Steele was compliant and approaching the vehicle of his own volition when Phillips asked/told him to "stop right there." No weapons were drawn. Absent supporting facts, the Court will not draw the inference that officer statements to pedestrians are inherently coercive. In sum, the record does not support the inferences the Court would necessarily have to draw to find that Steele met his burden of proof on the issue whether he was seized.

## CONCLUSION

Based upon the evidence currently before this Court, Steele was not seized prior to the time Officer Phillips arrested him. Therefore, Defendant's Motion to Suppress is DENIED.

ALL OF WHICH IS ORDERED.

---

**15.** As the officers' testimony revealed, Steele was *in fact* not free to leave and would have been compelled to remain. This fact, developed from the officers' disclosure of their subjective intent in pursuing Steele, is in itself irrelevant; the sole question is what a reasonable person would have believed would happen, not what actually would have happened. To be persuaded by the scant evidence developed by Steele at the hearing, this Court would have to rely too heavily on inferences about the officers'

conduct, which would place undue significance upon their subjective intent to stop and question Steele.

**16.** It appears likely that the defendants exited their van and immediately approached the officers because the defendants attempted to distance themselves from the contraband they desired to conceal (stolen air conditioners located inside the van).